# DENVER JOINT STOCK LAND BANK OF DENVER v. DIXON ET AL.

(No. 2205; February 24, 1942; 122 Pac. (2d) 842)

For the appellant, there was a brief by *Sullivan & Sullivan* of Laramie, and oral argument by *J. R. Sullivan*.

For the respondent, there was a brief by *C. A. Brimmer* and *G. R. McConnell* of Laramie, and oral argument by *Mr. McConnell.*

BLUME, Justice.

This action was brought by the Denver Joint Stock Land Bank of Denver, Colorado, against James Dixon, Harriet E. Dixon, Ellen E. Fox, Agnes Dixon, the First National Bank of Laramie, and the American National Bank of Cheyenne, to quiet the title to the N/2 of the SE/4 of Section 2, all of Sections 3, 10, 11, 12 and 14, in Township 18, Range 78, situated in Carbon County of this State. The First National Bank and the American National Bank filed disclaimers of any right in and to this property. Answers were filed on behalf of the remaining defendants. Agnes Dixon claimed certain oil and gas rights in and to Sections 3, 11 and 12. The court entered a judgment quieting the title in and to the plaintiff. From that judgment Agnes Dixon alone has appealed, and she will hereinafter be designated either by name or as the appellant.

No complete chain of title to all of the lands mentioned above appears in the record before us. It is claimed, however, that the controversy herein relates to Sections 11 and 12 above mentioned, and we shall

consider the cause in accordance with that claim. One Baxter Anderson received a patent to Section 12 without reservation of mineral rights on August 16, 1889. No conveyance from him appears in the record, but the Toltec Livestock Company subsequently. conveyed the property, as hereinafter mentioned, and inasmuch as it is one of the common grantors of the parties herein, we shall assume, for the purpose of this case, that the patentee conveyed his title to that company. Section 11 was originally owned by the Union Pacific Railroad Company, probably under a grant from Congress. It conveyed this section, together with other lands, on February 1, 1910, to the Toltec Livestock Company, reserving all coal and other minerals within and underlying the land, and the exclusive right to prospect in and upon the lands for coal and other minerals therein or which may be supposed to be therein and to mine for and remove from the land all coal and other minerals which may be found therein by anyone. No conveyance of the mineral rights by the Union Pacific Railroad Company appears in the record. The Toltec Livestock Company conveyed Sections 11 and 12 and other property on July 20, 1918, to the Rockdale Livestock Company, a Corporation, containing the provision "said lands being sold subject to any and all exceptions and reservations set out and contained in the patent from the United States and deeds from the Union Pacific Railroad or Railway Company." The Rockdale Livestock Company, on November 3, 1919, conveyed these sections and other lands to Eli Eades, containing the following reservation:

"Specifically reserving and excepting unto the grantor, its successors and assigns, all minerals, oil and gas in, upon or underlying said lands or any of them and the exclusive right to negotiate with, or procure mineral leases from the Union Pacific Railroad Company, its successors and assigns from said Sections One (1) and Three (3) with the perpetual right to enter upon

all of said premises, to prospect, explore, drill, operate, develop and dispose of all such minerals, oil and gas; all subject to the following further conditions:

Party of the second part shall be promptly compensated for all actual damages and injury to surface, improvements, grass and crops caused by said prospecting, drilling, operating and development work, and said party of the second part shall receive a one-sixteenth part of all minerals and oils produced and saved, and one-sixteenth of all royalties or rentals for gas from said Sections Eleven (11) and Twelve (12), and one-half of all net rentals, royalties or profits whatsoever, realized by the party of the first part, its associates, successors or assigns from all minerals, oil and gas from said Sections One (1) and Three (3).

To have and to hold the same, together with all and singular the appurtenances and privileges thereunto belonging, or in anywise thereunto appertaining, including the release and waiver of the right of homestead, and all the estate, right, title, interest and claim whatsoever of the said party of the first part, either in law or equity, to the only proper use, benefit and behoof of the said party of the second part, his heirs and assigns forever."

Eli Eades, in turn, on November 20, 1919, conveyed these sections to James Dixon and Harriet Fox Dixon, husband and wife, but containing the following reservation:

"subject, however, to the reservations, conditions and stipulations contained in the deed given by Rockdale Livestock Company to Eli Eades dated November 3, 1919, conveying the above described lands together with other lands, party of the second part, herein succeeding to a 1/2 interest in the rights acquired or held by parties of the first part under or by reason of the said exceptions, reservations, conditions and stipulations.

Hereby releasing and waiving all and any right existing under or by virtue of the Homestead Exemption Laws of the State of Wyoming Hereby granting to parties of the second part an undivided 1/2 interest in and to all oil or gas rights acquired or to be acquired by parties of the first part in and to Sections 1, 3, 11

and 12 in Township 18 North of Range 78 West or any part thereof.

To have and to hold the same, together with all and singular the appurtenances and privileges thereunto belonging, or in anywise thereunto appertaining, including the release and waiver of the right of homestead, and all the estate, right, title, interest and claim whatsoever of the said parties of the first part, either in law or equity, to the only proper use, benefit and behoof of the said parties of the second part their heirs executors and assigns forever."

It appears inferentially by a statement in the record that the Rockdale Livestock Company conveyed its mineral interests to the Dutton Creek Oil and Gas Company, on May 10, 1921. The latter company, in turn, on March 31, 1924, gave a lease to A. C. Jones, trustee, of sections 11 and 12 above mentioned, for the purpose of exploration for oil and gas, to commence drilling on or before July 1st, 1925. The lease recites that "it is understood that one Eli Eades and his grantor (grantee) James Dixon has a one-sixteenth interest in the oil rights and said above described premises." Judging from the contest in the case at bar, it would seem that oil is now being produced on the premises, or part thereof.

James Dixon and his wife, on January 29, 1925, made and executed to the Denver Joint Stock Land Bank a mortgage conveying all of the property the title of which is sought to be quieted herein, including Sections 11 and 12 above mentioned, to secure the sum of $25,000. It contained no reservation of any oil or gas rights. Default occurred in the terms of the mortgage, it was foreclosed, and a sheriff's deed was executed to the plaintiff herein on February 18, 1933, conveying the property contained in the mortgage. In the meantime, and on January 7, 1933, James Dixon and wife made and executed to Agnes Dixon, appellant herein, an assignment of all their right, title and interest in the oil and gas then or thereafter lying in or under

Sections 11 and 12 above mentioned and other property, and all right under and by virtue of the reservations made in the deed by Rockdale Livestock Company to Eli Eades, subsequently conveyed by him and by his wife as above mentioned, and all right and privilege of entering upon the lands searching for and drilling and extracting oil and gas therefrom.

The controversy herein is concerning these oil and gas rights, in so far as granted in the deeds to Eades and then to the Dixons, the plaintiff claiming that they were embraced within the mortgage above mentioned and that it had, accordingly, acquired all title thereto by virtue of the sheriff's deed to the land. Agnes Dixon, the appellant herein, on the other hand, claims that the oil and gas rights above mentioned were and are not a part of the real estate conveyed, but are rights in personal property which accrued and could accrue only after the oil and gas rights would be brought to the surface and hence were not conveyed by the mortgage. It may be mentioned here that the mortgage, after describing the property, also states that it is "together with the tenements, hereditaments and appurtenances all and singular thereunto belonging or in any wise appertaining, all the reversions, remainders, rents, issues and profits thereof," etc.

The parties seem to be agreed that the controversy depends mainly on the meaning given to the grant of oil or gas in the deed from the Rockdale Livestock Company to Eli Eades, and we shall consider the case from that standpoint. No question as to the ownership of mineral rights prior to that deed is raised herein. The deed presents some features not usual in the ordinary controversy concerning oil and gas rights. It conveys but the surface of the land, and at the same time grants a one-sixteenth of the oil produced on the land. No lease for the production of oil or gas existed at that time. But Summers on Oil and Gas, Sections

572 and 599, states that courts have recognized that a right to royalty may be reserved or granted before any lease is executed, and that such right is generally termed a perpetual non-participating royalty, if no right is granted or reserved to participate in the making of future leases. While in one clause all of the oil and gas in the land is specifically reserved by the Rockdale Livestock Company, it must be construed in conjunction with the clause dealing with the interest granted to Eades, and the right actually remaining in the Rockdale Livestock Company depends on the effect of that grant.

The contention of appellant is stated in her brief as follows: "The appellant contends that when the oil and gas is severed from the land where it was found it is personal property and is no longer any part of the real property. If, therefore, appellant's interest in the oil and gas produced and severed is determined only after the oil and gas are recovered from the ground it follows logically that her interest is personal property and not real property. It follows also that at the time that James and Harriet Dixon executed the mortgage which was afterwards foreclosed and title to the property vested by virtue of that foreclosure proceeding in the respondent here they were unable to convey any mineral interest because they had no such interest to convey. * * * the grant of royalty to Eades * * * was a personal grant." If appellant's interest is only a right in personal property and not an interest in real property—if, in other words, she disclaims, as she does according to this theory, any interest in the real property in controversy, then the title to such real property cannot, it would seem, concern her, and she cannot complain of the judgment herein, which seems to affect nothing more than what she concedes to be the actual situation here. While that seems to be true, it would not get us far in settling the bone of contention herein,

namely, as to whether or not the plaintiff has any royalty interest in the oil produced from the land, which is claimed by the appellant, notwithstanding the fact that she disclaims any interest in the land as land. So we shall proceed to consider that point. We could have wished that counsel would have enlightened us more as to the consequences of his theory.

In Callahan v. Martin, 3 Cal. (2d) 110, 43 P. (2d) 788, 101 A. L. R. 871, it appears that Martin claimed an interest in 3% of all oil and gas produced on the property in controversy by virtue of an assignment of a royalty interest in the land granted by the then owner of the property. Thereafter the owner of the land conveyed the fee thereof to one Tracy. Tracy conveyed it to Callahan. Callahan brought an action to quiet title against Martin, and the trial court upheld Callahan's contention, which was to the effect that a transfer of a royalty interest to Martin was merely a personal contract of the owner of the land, at most a contract for the sale of the oil brought to the surface and reduced to possession as personal property, and that it created in the assignee no rights in oil produced after his assignor had transferred the fee in the land. It may be noted that Callahan's contention that the right obtained by Martin was merely personal property is identical with the claim made by the appellant herein, but the conclusion drawn by the trial court in that case was that inasmuch as the interest of Martin was merely personal property, the contract was merely a personal contract with the owner of the land, in no way binding upon the transferee of the fee of the land. The Supreme Court held the interest to be real property, so we do not have its view of what the consequences would have been if the interest had been held to be personal property. But we find a case almost exactly in point in the case at bar upon the theory of appellant herein, namely, Curlee v. Anderson and Patterson,

(Tex. Civ. App.) 255 S. W. 622, in which the court held, as claimed by counsel for appellant in this case, that the royalty interest in land is merely personal property. One Kuehn, the then owner of the land, executed an oil and gas lease to the land in question, conveying all oil and gas interests to the lessee (just as in the case at bar, all oil and gas rights were reserved by the Rockdale Livestock Company), but reserving a royalty interest in the land similar to the royalty interest herein granted by the Rockdale Livestock Company. Kuehn subsequently conveyed to one Curlee one-half of his royalty interest. Thereafter the owner of the land executed a mortgage thereon, the mortgage was foreclosed, the land was sold and the purchaser brought an action against Curlee to quiet title to the land, claiming that Curlee's interest was but personal property. Curlee claimed that it was an interest in the real property. The court sustained the contention that it was but personal property, and held that, accordingly, no interest in the land was vested in him which could be made effective against the subsequent purchaser under the foreclosure, and quieted the title as against him. We need not determine the correctness of this decision on the theory that royalty is personal property (see Southwest Pipe Line Company v. Empire Natural Gas Co., 33 F. (2d) 248, 64 A. L. R. 1229), since we think that the royalty interest here involved cannot be considered to be personal property.

It is true, of course, that when oil and gas have been brought to the surface, they become personal property. State v. Snyder, 29 Wyo. 163, 197, 212 Pac. 758. And if the right under the deed to Eades consisted only of the right to receive a certain amount of oil, without reference to its source, then it might well be said that the right is one merely to personal property. But it consists of a right to receive the oil and gas from particular pieces of land. That is a factor which cannot

be ignored. We accordingly held in State v. Snyder, supra, that when oil is taken from the ground, part of the corpus thereof is taken. So that it can scarcely be doubted that the right is at least partially connected with the land, and cannot be said to be wholly unmixed with one in real property. It may be said, under our terminology dividing property into real and personal, to be one of a dual nature. It is not, then, perhaps surprising that some of the courts have, under particular circumstances, considered the right as personal property. Historically considered, the view is favored, we think, that it is an interest in real property, and a number of the courts now, some expressly, some impliedly, hold that the historical view coincides with public policy.

Coke wrote more than 400 years ago that "if a man seized of those lands in fee by his deed granteth to another the profits of those lands and to have and to hold to him and his heirs, and maketh livery secundam forman chartae, the whole land itself doth pass, for what is the land but the profits thereof, for thereby vesture, herbage, trees, mines, and all whatsoever parcel of that land doth pass." While this statement of this luminary of the law may not light the way exactly as does a sun, it may, nevertheless, be accepted as a morning star, at least dimly indicating the path along which we must travel. The writer of the note in 90 A. L. R. 775 thinks that the statement is applicable only when a perpetual right to rents and profits is granted. If that is true under all circumstances, the covenant or grant contained in the deed to Eades would seem to satisfy that requirement; the term is not limited, so that a profit in the land, at least as long as oil and gas are found therein, which may conceivably be in perpetuity, is granted therein. See Callahan v. Martin, supra; Dabney-Johnson Oil Corp. v. Walden, 4 Cal. (2d) 537, 52 P. (2d) 237, 245. Blackstone, fol-

lowing Coke to a very large extent, discusses the subject of real property and interest therein at great length. He treats of hereditaments—things which may be directly inherited, as contrasted with things which go to the personal representative of a deceased. He states: "Hereditaments, then, to use the larger expression, are of two kinds, corporeal and incorporeal. Corporeal consists of such as affect the senses; such as may be seen and handled by the body; incorporeal are not the subject of sensation, can neither be seen nor handled, are creatures of the mind, and exist only in contemplation * * * An incorporeal hereditament is a right issuing out of a thing corporate whether real or personal, or concerning, or annexed to, or exercisable within the same." Bk. II, c. II (17 Cooley's Blackstone, pp. 444, 446). This definition, on its face, would not necessarily make an incorporeal hereditament real property, but it must be taken in connection with the statement contained in paragraph 16 preceding, which states that "things real are usually said to consist in lands, tenements and hereditaments." The author, as already indicated, was considering the technical difference between property which at common law could be inherited directly by the heirs, or which would pass to the personal representative of the deceased, treating all the former under the head of real property. He followed Coke, who stated that anything which might be inherited was included in the term hereditaments (Coke on Littleton, 6a), which in turn included both land as well as tenements. The term hereditament has borne that meaning to this day. Kent stated that "things real consist of lands, tenements and hereditaments. * * *" 2 Commentaries 401. Williams on Real Property (24th ed.) p. 21, states that "the expression 'lands, tenements and hereditaments' was long and is still used in legal documents to describe property in land, as distinguished from goods and chattels or mov-

able property." "It therefore denoted real property." Idem. p. 89. See further, Words and Phrases, under "hereditament."

We must digress a moment. Modern writers, including judges, who have attempted to analyze legal conceptions and jural relations more closely than was done formerly, do not divide property into corporeal and incorporeal. They point out, logically enough, that what a man has consists of rights—taking that term now in its broadest sense, and including claims, powers, immunities, and privileges—and that all of these are necessarily incorporeal. See Tiffany, Real Property (3rd ed.) Sec. 2; Summers on Oil & Gas, Sec. 153. Hohfeld states: "Since all legal interests are incorporeal—consisting as they do, of more or less aggregates of abstract relations—such a supposed contrast as that sought to be drawn by Blackstone can but serve to mislead the unwary." Fundamental Legal Conceptions, p. 30. Blackstone calls ownership of land "corporeal," and an easement as "incorporeal." Prof. Kocourek, who has attempted to reduce the law to a scientific basis, as nearly as that is possible, states that "the right to ownership is no more corporeal than the right of easement." Jural Relations, p. 308. Salmond, Jurisprudence (7th ed.) pp. 278, 283, states that the distinction sought to be made between corporeal and incorporeal property, if literally applied, "is illogical and absurd." This author, as well as Prof. Kocourek, however, has no objection to the old terminology, if properly applied.

Conceding that all that was acquired under the deed from the Rockdale Livestock Company to Eades was a "right," whither are we led? That rights may differ in their nature and extent is conceded by all, and they may be the same whether it is in personal or real property. A man may have what is called in jus in re in either, which is a right *in it*, although, of course, the

enforcement and protection thereof may differ in the one case from that in the other. Sinclair v. Brougham A. C. (1914) 398, 431. In the Young Mechanic (1855), 2 Curtis 404, Mr. Justice Curtis, considering the nature of an admiralty lien held it to be "a right in the thing, a jus in re." Hohfeld, supra, 88, commenting on Jacobs v. Knapp, 50 N. H. 71, involving a statutory lien for lumbering, states that the right is one "in the broad sense of the term. It is difficult, therefore, to see why the term jus in re should not be applicable." In the case at bar, no direct interest in and to the oil in place is given under the covenant contained in the deed to Eades. That was reserved to the Rockdale Livestock Company, and the cases cited, therefore, fall somewhat short of giving us a clear solution of the problem before us by considering the subject in the light of "rights" as stated by modern writers. Is the jus in re in the case at bar given merely to the oil after it has come to the surface, or is the right more extensive? We have already pointed out that there is an element in the case at bar which is over and above that of a jus in re after it has come to the surface. The right to Eades was to oil and gas from particular land. Hence the right did not merely extend to the oil and gas after it was brought to the surface. In view of the reservation to the Rockdale Livestock Company, the right to the mineral in place is not absolute, but may be said to be inchoate, to attach definitely when the dormant state is disturbed and the oil and gas is on its way to the surface. It is not illogical, it seems, under the theory of rights here mentioned, to hold that there is a jus in re in and to the oil and gas still in the earth, the right merely continuing to and including the time when and after it becomes personal property. In any event, the theory here mentioned cannot be said to exclude that conclusion.

We return to Blackstone. In c. 3, Book II (Cooley's

Blackstone 1, p. 455), the author deals with "common or right in common," which, he states, "appears from its very definition to be an incorporeal hereditament; being a profit which a man hath in the land of another; as to feed beasts, to catch fish, to dig turf, or cut wood, or the like." It may be noted that he definitely refers it to land—a profit therein. The rights which he mentioned in this connection are commonly called profits a prendre—a term taken from the French, meaning literally "profits to take," the phrase "from land" being implied. Coke called it "apprender" and included it within the meaning of "tenements." Coke on Littleton, 6a. Further illustrations are given in 28 C. J. S. p. 32.

It is, of course, apparent that the right to take oil and gas from the land is of the same nature as the incorporeal hereditaments mentioned by Blackstone at the place just cited. In Boatman v. Andre, 44 Wyo. 352, 362, 12 P. (2d) 370, this court stated that the right created by a lease is to search for oil and gas, and if either is found, to remove it from the land, and that "this would appear to make it a profit a prendre * * * and hence an incorporeal hereditament." That seems to be in accord with the general holding. Consistency, if not public policy, would seem to suggest that a grant or a reservation of part of that profit should be considered as of a similar, even though not of the identical, nature. A profit a prendre is, as already indicated, a right to take a certain thing or things from the land of another. If, accordingly, the right to take does not exist, the right cannot, at least strictly, be called a profit a prendre. The point was considered at considerable length in Callahan v. Martin, 3 Cal (2d) 110, 43 P. (2d) 788, 101 A. L. R. 871, where the court held a royalty interest to be in the nature of a profit a prendre. In that case a part of the royalty interest had been assigned without giving the assignee the right to enter. The court held that such right

should be held to be implied, and that it would, under proper conditions, be enforced by the courts. See article in 11 So. Cal. L. R. 319-328 for a criticism of this view. It may be that such right should be implied in the case at bar, as against the grantor and its successors in interest, under certain conditions, in order to effectuate the grant of a right in the oil and gas. But it is not, we think, necessary to decide that point. We are not interested, in this case, in the particular name to be given to the right, and should not determine its full extent, since parties interested in that point are not before us. There would seem to be no reason why an estate in land may not be created which is less than a profit a prendre. That is recognized in La Laguna Ranch Co. v. Dodge (Cal.) 114 P. (2d) 351, 354. And see above article in 11 So. Cal. L. R. at page 326. And by the great weight of authority, especially as clarified by the decisions in the last decade, a royalty interest, at least if of a permanent nature, has been held to be real and not personal property, though the reasons assigned do not all agree. Summers, Oil & Gas, Sec. 572, states that "perhaps it may be safely asserted that oil royalty is usually real property." It would, indeed, seem that at the present time no decisions from any state, except Ohio, can be relied on as holding the contrary, in cases where the right is not limited to any definite term of years. The subject has been so extensively treated by Mills & Willingham, Law of Oil & Gas, pages 179-180; Summers on Oil & Gas, permanent edition, section 572, and subsequent sections; notes 90 A. L. R. 770, 101 A. L. R. 884, 131 A. L. R. 1371, that a review of the many cases would seem to be superfluous. Some of the leading cases so holding and discussing the subject thoroughly are Sheffield v. Hogg, 124 Tex. 290, 77 S. W. (2d) 1021, 80 S. W. (2d) 741; Arrington v. United Royalty Company, 188 Ark. 270, 65 S. W. (2d) 36, 90 A. L. R. 765; Callahan v. Martin,

supra. These and other cases hold royalty interest to be real property, even though not payable by a portion of the oil to be produced but in money. See on that point also Young v. Poling (Tex. Civ. App.) 154 S. W. (2d) 686; Tennant v. Dunn, 130 Tex. 285, 110 S. W. (2d) 53, 57. The view taken by these courts is the view taken in United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844, where the court stated:

"The rents and royalties were profits issuing out of the land. When they accrued they became personal property; but rents and royalties to accrue were a part of the estate remaining in the lessor. As such they would pass to his heirs and not to his personal representatives. * * * The fact that rent is to be paid in money does not make it any the less a profit issuing out of the land."

In Evans v. Mills (CCA) 67 Fed. 840, where it was contended that the reservation of 1/8 royalty was merely a personal right, the court stated that the interest so reserved "does not pass to the lessee, it remains owned as realty by the lessor * * * the estate granted in such instrument is the oil and gas, less the exception contained in the royalty clause, which exception is real estate and remains the property of the lessor." It is of course apparent that a grant of a similar interest, as in the case at bar, should have a similar effect, vesting the right in the grantee as real estate.

In the note to 90 A. L. R. 774 a number of cases are cited as holding that royalty is personal property. Among them are cases from the Court of Civil Appeals in Texas. But the view to the contrary was adopted by the Supreme Court of Texas in Sheffield v. Hogg, supra. Some cases from West Virginia, too, are cited in the foregoing note. Without taking the time to analyze them, suffice it to say that Summers on Oil & Gas, Section 584, takes the view that the cases from that state "clearly establish that oil and gas are real property." The decisions from Pennsylvania are not alto-

gether satisfactory. In 1869 the supreme court of that state held that a royalty interest is an interest in the land, and a sale thereof must be in writing. Henry v. Colby, 3 Brewster 171. But in Wettengel v. Gormley, 184 Pa. 354, 39 Atl. 57, the court held that the right to unaccrued royalty passes to the personal representative of the deceased lessor. The subject of the nature of oil royalty was to some extent discussed in Baird's Appeal, 132 Pa. Super. 573, in which it is stated in part:

"The combined interests (of the lessor and lessee) compose the whole title and the interests are complementary. * * * The right to receive that royalty is an incident to an estate in the oil and gas remaining in the grantor as an owner of land. When the grantor, after making such a contract, conveys or devises his interest in the oil or gas, the right to receive the royalty passes to the grantee or devisee when the conveyance becomes effective, unless he expressly reserves the royalty."

The decision was affirmed on this opinion in 334 Pa. 410, 6 Atl. (2d) 303. The lease in that case was for so long as oil and gas should be found in the premises, while the lease in the Wettengel case was for a limited number of years. It would accordingly seem that at least in cases in which the right reserved or granted is not for a limited period of years, it is now, in that state, considered to be real and not personal property.

In Dutton v. Interstate Investment Corporation (Cal. App.) 113 P. (2d) 492, the court held a royalty interest under a lease which ran for the limited term of 20 years, to be personal property, and that a sale of a part thereof did not need to be in writing. See for a similar view under such a lease Arrington v. United Royalty Co., supra. The holding doubtless goes back to Blackstone, II, c. 24, where the author deals with leaseholds for a limited time, calling them a chattel real. There is one, and possibly important, difference. Blackstone dealt with leases pertaining to the annual

produce of the soil. Oil leases deal with the corpus of the land. However, since the right granted in the case at bar is not limited in time, we need not pass upon that point.

As already remarked, courts are not agreed on the reasons for holding royalty interests, such as here involved, to be real and not personal property. That is by reason of the fact that the subject of rights in oil and gas is comparatively new, and as stated in Dabney-Johnson Oil Co. v. Walden, 4 Cal. (2d) 637, 52 P. (2d) 237, "the law pertaining thereto is still in a formative state." Most of the courts simply rely upon previous authorities. In Callahan v. Martin, supra, the court put it, partially, or mainly, on the fact that royalty is in the nature of rent. If, however, at the time of the grant or reservation of an oil or gas right, no well exists on the land, that can hardly be a proper basis. The court recognized this fact in La Laguna Ranch Co. v. Dodge, (Cal.) 114 P. (2d) 361, and extending its holding in the Callahan case, stated that "the purpose and scope of all such royalty interests are so similar that all should be considered equally to be incorporeal interests in real property." In the very exhaustive opinion of Sheffield v. Hogg, supra, the Supreme Court of Texas did not alone rely upon numerous previous authorities, but it also held that "were the stability furnished by these rules (holding royalty interests to be real property) withdrawn and the fundamental contracts, on which the oil business so largely rests, be adjudged by the Supreme Court to create mere rights in personalty at some uncertain date in the future, the structure of the business would be seriously, if not fatally, jeopardized."

Since the law on this subject is said to be still in the formative stage it may not be amiss to repeat and amplify some of the statements made in the earlier part of this opinion, indicating, perhaps, an independent or

additional reason why interests such as herein involved should be considered real and not personal property, or perhaps, stating these reasons merely in different language. That view to some extent goes back to the case of State ex rel. v. Snyder, supra, and is this: The right to a royalty interest in oil does not merely attach after the oil has been severed from the ground and has become personal property. It is not merely rent issuing out of the annual produce of the land. It goes further than that. The right, extending as it does to oil which is to come from particular land, extends to and is necessarily connected with the corpus of the land, and is, accordingly, a right which exists in the oil which still is in place ,inchoate though it may be, follows it as it comes from the ground and still is attached after it has become personal property. To call it personal property is but emphasizing a particular stage of the right on its way to fulfillment. It ignores that it is a right which necessarily extends to part of the corpus of the land. If it were possible to divide the oil in the ground in such a manner that the land in which the royalty portion would be found could, together with the royalty interest, be delivered to the owner of the royalty interest intact, then clearly it would be considered as real property. That is not possible, but in theory the equivalent of that right, aside from bringing the oil to the surface, is substantially the right of the owner of a royalty interest in particular land. The fact that real property, when severed, becomes under our terminology and classification, personal property, should not obscure the real nature of the right. Terminology is convenient, and in fact necessary, but it should not be abused. The learned author of the annotations in 90, 101 and 131 A. L. R. supra, thinks that courts have confounded the title to the oil in the ground with the title under an agreement for royalty. The foregoing statements may, possibly, aid in clarifying the subject.

In Sheffield v. Hogg, supra, the court, considering a royalty interest in the nature of rent, cites Thompson and Tiffany on Real Property to the effect that both the benefit as well as the burden of the covenant to pay rent runs with the land. Summers on Oil & Gas, Sec. 600, states that "the covenants of an oil and gas lessee to pay rent, royalty and delay rental are generally held to be covenants running with the land." The grant, or covenant, contained in the deed from the Rockdale Livestock Company to Eades is similar to the covenant of an oil and gas lessee to pay or deliver a definite amount of royalty. And it may, accordingly, be that the grant or covenant in this case may be considered in that light, as well as in the light heretofore mentioned, though we need not say so in this case.

It seems to be conceded herein that if the royalty interest herein considered is held to be real and not personal property, then the mortgage given in this case carried the royalty rights with it, since no reservation thereof appears therein. And that such is the rule has been held in two recent well-considered cases. Williams v. Union Bank & Trust Co., 283 Ky. 644, 143 S. W. (2d) 297, 131 A. L. R. 1365; White v. McVey, 168 Okl. 19, 31 P. (2d) 850, 94 A. L. R. 656. We need not, accordingly, consider the subject further.

It follows that the judgment herein should be affirmed, and it is so ordered.

*Affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.