**AMERADA PETROLEUM CORPORATION, a corporation, Plaintiff,**

v.

**RIO OIL CO., a corporation, Hazel C. Browning, et al., Defendants.**

Civ. No. 4543.

United States District Court
D. Wyoming.

Jan. 29, 1964.

A. G. McClintock, Cheyenne, Wyo., and John S. Miller, Tulsa, Okl., for plaintiff.

J. J. Hickey and William G. Walton, of Hickey, Raper, Rooney & Walton and Carl L. Lathrop, of Lathrop, Lathrop & Tilker, Cheyenne, Wyo., for defendants.

KERR, District Judge.

Amerada Petroleum Corporation, hereinafter referred to as "Amerada", instituted this suit to quiet title to its leasehold estate in and to the minerals underlying certain lands situated in Campbell County, Wyoming. The litigation primarily concerns the right to possession of the minerals which is claimed by Amerada and by Rio Oil Co., hereinafter referred to as "Rio". Rio, the Brownings and the Stevens' filed a motion to dismiss the complaint because of the absence of Boyd Miller, allegedly an indispensable party plaintiff, because he was the lessor of Amerada's leasehold interest. This court overruled the motion. Subsequently, upon motion of the defendants, this court ordered that Boyd Miller be joined as a party defendant.

In their amended answer and counterclaim, defendants Rio and the Brownings and the Stevens', denied in general the interest of Amerada in the minerals; and in their counterclaim and cross-claim the defendants prayed for a decree quieting title to their interests against Amerada and defendant Boyd Miller. The individual defendants, the Brownings and Stevens', also brought a separate cross-claim against Boyd Miller asserting their title against him with respect to additional lands in Wyoming, not in issue in the complaint.

Amerada filed its reply to defendants' counterclaim, and Boyd Miller filed his separate reply to the counterclaim and answer to the cross-claim. A trial was had on the merits of the case, at the close of which the defendants moved to dismiss for want of jurisdiction on the ground that Boyd Miller is an indispensable party plaintiff and his re-alignment as plaintiff would destroy the diversity of citizenship on which federal jurisdiction was invoked.

It is true that relief cannot be granted and the action must be dismissed if all indispensable parties are not be-

fore the court, and the court must align the parties as plaintiffs or defendants according to their interests. There is no principle of law, however, which requires the court to strain toward a holding of indispensability of parties plaintiff. In the interest of justice, its powers are exceedingly broad and elastic. See Mackintosh, et al., v. Estate of Marks, et al., 5 Cir., 225 F.2d 211 (1955), cert. den., 350 U.S. 934, 76 S.Ct. 306, 100 L.Ed. 816. If, however, diversity will be destroyed by bringing in parties the court will not require them to be brought in if relief can be given without prejudicing the rights of the absent persons. Hudson, et al., v. Newell, et al., 5 Cir., 172 F.2d 848 (1949). Furthermore, it is elementary that a plaintiff has the right to select his own forum and that a defendant may not alter the substantial controversy or add parties so as to oust the court of its jurisdiction over the original parties. Edenborn v. Wigton, 5 Cir., 74 F.2d 374 (1934), cert. den. Northern Trust Co. of Chicago, Ill. v. Edenborn, 294 U.S. 719, 55 S.Ct. 546, 79 L.Ed. 1252; Texas Pac. Coal and Oil Co. v. Mayfield, et al., 5 Cir., 152 F.2d 956 (1946).

■ An indispensable party has been defined as one without whose presence before the court a final decree could not be made without either affecting his interest or leaving the controversy in such a condition that its final determination might be wholly inconsistent with equity and good conscience. Shields v. Barrow, 17 How. 129, 15 L.Ed. 158; Turner, et al. v. Brookshear, et al., 10 Cir., 271 F.2d 761 (1959); Reid, et al., v. Reid, 10 Cir., 269 F.2d 923 (1959); Brown v. Denver Omnibus & Cab Co., et al., 8 Cir., 254 F. 560 (1918). Whether or not a person is an indispensable party cannot be determined by a prescribed formula because the facts peculiar to each case are determinative of that question. Niles-Bement-Pond Company v. Iron Moulders Union Local No. 68, et al., 254 U.S. 77, 41 S.Ct. 39, 65 L.Ed. 145 (1920).

■ This is not a suit to adjudicate the record title interest of plaintiff's lessor, Boyd Miller. Amerada is not seeking to enforce rights or obligations held jointly with Boyd Miller. An oil and gas lease in Wyoming conveys a sufficient interest in realty to merit a quiet title action. Torgeson v. Connelly, 348 P.2d 63 (Wyo.1959); Denver Joint Stock Land Bank of Denver v. Dixon, et al., 57 Wyo. 523, 122 P.2d 842, 140 A.L.R. 1270 (1942). Amerada is not claiming loss or injury to its lessor nor is it suing to protect or delineate its lessor's interest.

■ Boyd Miller is before this court only upon the application of the defendants themselves to answer their counterclaim and cross-claim. He is represented by his own counsel, who has defended his interests which were assailed by the defendants. He has not prayed for any affirmative relief and he is not entitled to share in any recovery which Amerada might realize. The fact that Boyd Miller would naturally favor the relief prayed for by Amerada or the fact that their positions with respect to the applicable law may coincide occasions no realignment of parties, for the relief prayed for by Amerada can be denied or granted without adjudicating the interest of Boyd Miller. Republic Nat. Bank & Trust Co., et al., v. Massachusetts Bonding & Ins. Co., et al., 5 Cir., 68 F.2d 445 (1934).

■ I am in accord with those cases holding that the lessor is an indispensable party where the lessee is the defendant and a decree would necessarily affect the rights of the defendant's lessor; where a fund is in issue or rental or royalty payments would be affected; where cancellation of deeds or other instruments is prayed for; or where the parties seek to establish boundaries between adversely held lands.

None of these issues, however, is before this court. The genuine, substantial controversy as determined from plaintiff's complaint involves only Amerada's claim of a leasehold estate against the hostile claims of Rio, the Brownings and Stevens'. It cannot be arbitrarily assumed that a lessee does not have a substantial and real controversy with con-

flicting lessees. All claimants adverse to the plaintiff are in court.

For the foregoing reasons, I am convinced that defendants' motion to dismiss is without merit and should be denied. I am not inclined to realign the parties for artificial reasons to defeat the jurisdiction of this court. This court has before it, in their proper positions as plaintiff and defendants, all the parties affected by the issues raised in plaintiff's complaint; and it also has before it all the parties to the controversy raised by Rio and the Brownings and Stevens' against Boyd Miller. A final determination of the claims raised by the complaint and by the counterclaim and cross-claim will not, therefore be made without the knowledge of any interested persons.

The lands covered by Amerada's lease are described as follows:

Township 50 North, Range 69 West, Section 27: NW¼, N½SW¼; Section 28: E½ NE¼

The conflicting interests to the leasehold estate in and to the minerals underlying those lands emanate from the fact that the estate of John Jacobs was never probated in Wyoming, and from the additional fact that the land in Wyoming owned by John Jacobs at the time of his death was subsequently acquired by tax deed issued to Edward Miller, a brother-in-law of John Jacobs. Edward Miller later deeded the property in dispute to his son Boyd Miller, who leased the mineral interests to Amerada. The defendants Hazel Browning, Wayne Browning, Lillian Browning, James Browning, Margaret Browning, Robert Browning, Edna Browning, Pauline Stevens, Madolyn Stevens and Robert Stevens (herein referred to jointly as the Brownings and the Stevens') claim fee title to the surface and mineral estates as the descendants of the heirs of John Jacobs, who died intestate in Iowa. They executed oil and gas leases to Rio.

The facts are these: John Jacobs was a resident of Iowa. On January 27, 1923, he acquired fee title to the lands in Campbell County, Wyoming, from the patentees by warranty deed recorded August 14, 1923, in Campbell County, Wyoming. On July 2, 1927, he conveyed the lands to Boyd Miller, his nephew, who reconveyed them to John Jacobs on September 29, 1927. Both of these warranty deeds were duly recorded in Campbell County, Wyoming.

On December 26, 1931, John Jacobs died intestate in Iowa. His estate was probated in Iowa, the decree of distribution showing that his heirs were his sisters, Carrie Browning, Gertrude Browning and Valetta Mae Miller, and his nephew and niece, Howard and Lila Stevens, the children of his sister Catherine Stevens, who predeceased him.

On January 7, 1932, Edward Miller, the husband of Valetta Mae Miller, was appointed Administrator of the Estate of John Jacobs in Iowa. On October 17, 1932, he wrote to the attorney for the estate concerning the property in Wyoming. In November 1932 that attorney wrote to the county recorder and to the county treasurer of Campbell County, Wyoming, inquiring about the status of the property and its probable value. Letters written on March 13, 1933, from Gertrude Browning and Lila M. Stevens indicate that they thought that John Jacobs owned some land in Montana on which he was going to pay the taxes when he dropped dead in the bank while preparing to get a draft. The attorney for the estate answered these letters on March 16, 1933, advising these heirs of John Jacobs that the property about which they were inquiring was in reality in Wyoming, and that he had made inquiries concerning its value. He informed them that the probate of the estate in Iowa included only Iowa property and that separate probate proceedings would have to be instituted in Wyoming, but that if the Wyoming property were practically valueless it would be foolish to entail any expense in probating the estate in Wyoming. It appears that the heirs of John Jacobs were unimpressed with the value of the Wyoming property and that they advised Edward

Miller to "just let it go". On March 18, 1933, Edward Miller was discharged as Administrator of the Estate of John Jacobs in Iowa.

On September 15, 1933, a certificate of purchase covering the land in Amerada's lease was issued to Campbell County, Wyoming, for unpaid delinquent taxes for the year 1932. On October 1, 1935, that certificate of purchase was purchased by and assigned to Edward Miller. On April 4, 1939, Edward Miller published the Notice of Application for Tax Deed addressed to John Jacobs, Rozet, Wyoming, and to whom it may concern, stating that said application would be made on July 21, 1939. On October 8, 1940, a tax deed was executed by Campbell County, Wyoming, to Edward Miller, a widower, Valetta Mae Miller, his wife, having died on August 26, 1940. This tax deed was duly recorded October 8, 1940, in the records of Campbell County, Wyoming. On June 19, 1941, Edward Miller conveyed all of his right, title and interest in the property by quit claim deed to Boyd Miller, the son of Edward and Valetta Mae Miller. This deed also was duly recorded in Campbell County, Wyoming, on July 3, 1941. On October 4, 1948, Boyd Miller executed an oil and gas lease to Amerada Petroleum Corporation which was recorded in Campbell County, Wyoming, and which was renewed by another ten year oil and gas lease on July 26, 1958, also recorded in Campbell County, Wyoming. Such is the chain of title by which Amerada claims its leasehold interest to the minerals underlying the lands in dispute described in plaintiff's complaint.

The peaceful possession of the leasehold interest in the minerals enjoyed by Amerada for approximately thirteen years was disrupted in July 1961 when oil and gas leases were executed by the Brownings and Stevens' to Rio embracing the same mineral estate described in plaintiff's lease. The Brownings and Stevens' claim that they inherited an interest in the property as descendants of the sisters of John Jacobs. They allege that all that Boyd Miller could lease to Amerada was a one-fourth interest in the mineral estate; and that as successors in interest to the heirs of John Jacobs they had right, title and interest in three-fourths of the estate which they could effectively lease to Rio. They protest the validity of the tax deed to Edward Miller and of his quit claim deed to Boyd Miller. They contend, also, that any title which might have been acquired by Edward Miller was held in trust for the heirs of John Jacobs because of his former fiduciary role as administrator of the Estate of John Jacobs. They rely on a theory of co-tenancy because Edward Miller was the husband of Valetta Mae Miller, one of the sisters of John Jacobs. They challenge the adverse possession of Edward and Boyd Miller, and allege that if it were in fact adverse, that it was purposefully and fraudulently concealed from them, from the heirs of John Jacobs, and from the probate court in Iowa.

■ None of the theories or contentions advanced by the defendants is supported by the law or by the evidence. Defendants have failed to sustain their burden of proving any fraudulent or secret acts allegedly designed to conceal the existence of the Wyoming property or to defeat their rights and interests or those of their ancestors. There is uncontroverted evidence that two of the heirs of John Jacobs, and that the Administrator of the Estate and the Attorney for the Estate knew of the Wyoming property during the administration of the Estate in Iowa. The parties accept as a fact that John Jacobs died from an apparent heart attack in an Iowa bank while purchasing a draft with which to pay the taxes on the Wyoming lands. All instruments affecting this property were duly recorded, thus giving notice to all the world. The reasonable and only inference to be deduced from the evidence as a whole is that the survivors of John Jacobs were not defrauded or deceived and that they were not interested in saving the Wyoming property either to

share in its expense or to enjoy its questionable value, until exploration for oil was commenced in that vicinity.

No complaint of any malfeasance or misfeasance or violation of a trust was ever made against Edward Miller between the date of his appointment as administrator in 1933 and the date of the death of the last heir of John Jacobs in December 1952. Defendants have cited no authority to support their position that Edward Miller acquired the property in trust for the heirs of John Jacobs. I know of no rule of law that requires an administrator of an estate in Iowa to preserve property in Wyoming for heirs who knew of it and did not pursue any claim to it; and I can find no authority which would impose a trust on such property acquired by the administrator two or seven years after he has been discharged from the duties of the administration of the Iowa estate.

The further claim that the Brownings and Stevens' inherited an interest in the Wyoming property is likewise without merit. At no time has that property been probated. No decree of distribution nor determination of heirship has ever been made by a Wyoming Court with respect to the property in Wyoming owned by John Jacobs at the time of his death; and no adjudication of heirship is now made by this court.

Defendants argue that the entire tax proceedings and the tax deed were invalid, and that no notice of an adverse holding was ever given by Edward Miller and Boyd Miller. The adverse possession of Boyd Miller and of his predecessor in interest is clearly supported by the evidence. Edward Miller and Boyd Miller have been in actual exclusive and adverse possession of the surface and mineral estates in the lands continuously since at least October 8, 1940, when the tax deed was issued. At all times since 1948 Amerada has been and now is in constructive possession and is entitled to actual possession of the mineral estate for the purpose of exploring and developing the same for oil, gas and other hydrocarbons.

Boyd Miller claims title and ownership of the property by adverse possession by virtue of the quit claim deed and the tax deed. In Wyoming, a claim of title is sufficient to initiate adverse possession. Bruch v. Benedict, et al., 62 Wyo. 213, 165 P.2d 561 (1946). The taxes assessed against the Wyoming property were paid by Edward Miller from 1933 to 1949 and from 1949 to date by Boyd Miller. Such payment is regarded as evidence that the possession is adverse.

Adverse possession is further evidenced by the continued course of conduct of the Millers. In 1940 Edward Miller leased the surface to Oscar Heptner for grazing purposes, and since 1941 to date Mr. Heptner has leased it from Boyd Miller. Mr. Heptner testified that he originally paid Edward Miller $75.00 a year rental, that he paid Boyd Miller an annual rental of $200.00, and that since 1958 he has paid Boyd Miller $600.00 a year. Heptner uses the entire 640 acres as one unit. He improved the house which was on this property and lived in it between 1940 and 1953, and he remodeled all the fences to four and five wire fences, and improved the lands with reservoirs and wells. Mr. Heptner testified that he has cultivated part of the land. His arrangement with the Millers was oral until October 5, 1957, when he entered into a five year written lease with Boyd Miller to commence March 1, 1958. Mr. Heptner recalled that Boyd Miller was on the land in 1948 when Mr. Miller gave Mr. Heptner credit on the rental for shingling the roof on the house. He always considered that the Millers owned the property. As their tenant he has been in continuous possession of the land since 1940.

In addition to the grazing leases, Boyd Miller executed the oil and gas leases to Amerada beginning October 4, 1948, about which reference has already been made. As lessee of Boyd Miller Amerada has been in actual or constructive posses-

sion of the minerals under the land since 1948.

Defendants argue that Boyd Miller must have known that the statute had not been complied with and that notice of his application for a tax deed had not been legally given. Any knowledge of any defect of his title which Boyd Miller might have had was kept locked in his heart, and does not destroy the adverse nature of his possession nor interrupt his adverse possession. The Millers were never ousted from possession; they never abandoned their possession; and until 1961 no one went into possession adverse to them. At all times from 1940 until the commencement of this suit in September 1961, Boyd Miller and his predecessor in interest have exercised uninterrupted dominion and control over the property. The elements of adverse possession required by the Wyoming law as enunciated in Bruch v. Benedict, et al., 62 Wyo. 213, 165 P.2d 561 (1946), are satisfied by the evidence adduced at the trial of this case. The validity of plaintiff's oil and gas lease is supported by the evidence that its lessor held the property by adverse possession for more than the prescriptive period of ten years.

Defendants' hostile claims against plaintiff and Boyd Miller must fail, also, under the doctrine of laches. That doctrine must be relentlessly enforced under the circumstances of this case because of the fluctuating and speculative character of oil and gas leases. Contrary to the best reasoned and most equitable principle of diligence, everybody who might have asserted an interest in the Wyoming property owned by John Jacobs at the time of his death maintained strict inertia from 1933 to 1961. Neither the heirs of John Jacobs, nor their descendants prosecuted their claims to the property with due diligence. Not until Rio instigated an interest in the property in 1961 did the Brownings and Stevens' attempt to resurrect stale titles. They did not assert their ownership or pursue their rights until after death had sealed the lips of all the persons who had first-hand knowledge of the facts and circumstances affecting the lands and the interest therein. Mining and oil properties require extremely prompt action because of their unstable and unpredictable value. Taylor v. Salt Creek Consol. Oil Co., et al., (Wyo.) 8 Cir., 285 F. 532 (1922).

Defendants' delay in prosecuting their claims is not satisfactorily explained or excused. Their ancestors knew about the property, thought it worthless, and did nothing about probating it. At least some of the Brownings and Stevens' themselves, knew about the property at the time of the probate of the Estate of John Jacobs in Iowa in 1933. James Mark Browning saw the letter to his Mother, Gertrude Browning, representing that the Wyoming land was worthless, and he stated that he "just never paid any attention to it". He said, also, that his brother, Robert Mark Browning, another defendant herein, told him about the letter and what it represented. He admitted that though he had general knowledge in 1933 as to the existence of the property in Wyoming belonging to John Jacobs, he didn't do anything about it until approached by Rio to lease the mineral estate and participate in the instant law suit.

Furthermore, the records concerning the Wyoming property were public and open to the heirs of John Jacobs and to their descendants to ascertain whether or not they had any interest in the Wyoming property. The property apparently was not sufficiently challenging until 1961. The rule of laches must foreclose tardy claimants from asserting any rights in property when they sit quietly by and permit some one else "to bring into form and being a latent property right" which only in recent years appeared to have considerable or potential value. Hodgson v. Federal Oil and Development Co., et al., 285 F. 546 (Wyo.) (1922).

From the foregoing state of facts and respectable authorities, it is my conclusion that Boyd Miller was the

owner of the land through adverse possession and that having good title thereto through adverse possession he had the right to lease the minerals to Amerada. I make no adjudication, however, of Boyd Miller's title. I hold only that Amerada Petroleum Corporation is the owner of a good, valid and effective oil and gas lease covering the entire mineral estate in the lands described in its complaint, and that it is entitled to the possession of the full and unqualified right to explore and develop the lands for oil, gas and other hydrocarbons according to the terms of its lease dated July 26, 1958. I hold, also, that the title of Amerada Petroleum Corporation in and to the leasehold estate in the lands is quieted against all claims, demands and assertions of the defendants Rio Oil Co., the Brownings and the Stevens', and that said defendants should be forever enjoined and restrained from asserting any claim in or to said leasehold estate.

It is the further holding of this court that the defendants Rio Oil Co., and the Brownings and Stevens' should take nothing by their counterclaim; that said defendants have no right, title, estate, interest or claim whatsoever in or to the mineral estate in the lands except whatever interest or title defendant Rio Oil Co. might have by virtue of the mineral deed to it from Boyd Miller, no adjudication of which is made in this memorandum; that the oil and gas leases executed by the Brownings and the Stevens' to Rio Oil Co. are null and void; and that said defendants and Rio Oil Co. should be forever enjoined and restrained from asserting any right, title, or interest in the leases executed in July 1961 or in the minerals underlying the lands pursuant to said leases.

The cross-claim of the Brownings and Stevens' against Boyd Miller involves lands in Sections 21 and 22 in which Amerada claims no leasehold interest. Boyd Miller acquired these lands directly from John Jacobs by warranty dated July 2, 1927, which was duly recorded in Campbell County, Wyoming. The deed was regular on its face and recited that good and valuable consideration had been given therefor by Boyd Miller. The evidence concerning this deed, however, is that the conveyance was made by John Jacobs to avoid some creditors' claims which might be imposed upon his Wyoming property, and that the deed covered all his land in Wyoming, including that described in the plaintiff's complaint and that described in the cross-claim, totaling 640 acres. In September 1927 Boyd Miller offered to reconvey to John Jacobs the whole tract of 640 acres in Sections 21, 22, 27 and 28. John Jacobs accepted the reconveyance of the lands in Sections 27 and 28, but refused to accept the acreage in Sections 21 and 22. Record title ownership of these lands, therefore, has been at all times since 1927 and is now in the name of Boyd Miller. By their cross claim the Brownings and Stevens' attempt to impose a trust on the lands in Sections 21 and 22 on the theory that Boyd Miller held them in trust for John Jacobs and ultimately for his heirs and their descendants, the defendants herein. In the alternative they argue that John Jacobs made a gift of the lands in Sections 21 and 22 to Boyd Miller which he never accepted as he testified that he never considered that the conveyance amounted to a gift. I find that the evidence of adverse possession hereinbefore discussed with respect to the lands described in the complaint applies also to the lands described in the cross-claim. They were included in the grazing leases to Mr. Heptner, who used them as one unit with the lands in Sections 27 and 28. Boyd Miller at all times paid the taxes assessed against the lands. I find also that the deed from John Jacobs to Boyd Miller in 1927 was a completed conveyance of the land in Sections 21 and 22; that such conveyance was not a gift; and that no facts have been shown to exist which would warrant the imposition of a trust on such property for the benefit of the Brownings and Stevens'. I find, therefore, that the defendants Brownings and Stevens' should take nothing by their cross claim against Boyd Miller.

This opinion sufficiently states the Findings of Fact and Conclusions of Law of the Court. Further Findings of Fact and Conclusions of Law are not necessary. Within fifteen (15) days from this date plaintiff will submit proposed Judgment in conformity with this opinion, each party to pay its own costs.