PAULINE R. BRUCH, *Plaintiff and Respondent,*
vs.
EMMA BENEDICT, *Defendant,* LOUIE BENEDICT,
*Defendant and Appellant,* BARNES BROTHERS,
INCORPORATED, ET AL., *Defendants.*

(No. 2325; January 29th, 1946; 165 Pac. 2d 561)

214

216

218

For the defendant and appellant the cause was submitted on the brief and also oral argument of Hon. C. O. Brown and Mr. T. C. Daniels, both of Douglas, Wyoming.

For the plaintiff and respondent the cause was submitted on the brief of Maurer and Garst of Douglas, Wyoming, and oral argument by Mr. Joseph Garst.

220

222

## OPINION

BLUME, Chief Justice.

This is an action, brought by Pauline R. Bruch, to quiet title to the Southwest Quarter of Section Twelve, and the West Half of the West Half of Section Thirteen, Township 33 North, Range Sixty-nine West of the Sixth P. M., in Converse County, Wyoming. The action was commenced on July 22, 1944; none of the many parties appeared in the action except Louie R. Benedict. The Court entered judgment for the plaintiff, quieting title to the foregoing land in her. From that judgment the defendant, Louie R. Benedict, has appealed. He will ordinarily be referred to herein as the defendant, and the plaintiff as plaintiff.

The petition, among other things, alleged that "plaintiff is the owner and she and her immediate predecessors in title have been in the actual, open, notorious and exclusive and continuous possession for more than ten years prior to the commencement of this action" of the lands above described. The defendant answered, admitting some of the allegations and denying others. In Paragraph III he stated that "the plaintiff herein unlawfully keeps this answering defendant out of possession of said property and denies the right of this answering defendant in said real property". The defendant filed a cross petition claiming title to the property and the right to the immediate possession thereof. Plaintiff in reply alleged, among other things, that she and her predecessors in interest to said land had been in possession thereof ever since July 11, 1928.

The land in controversy was filed on as a homestead by one Henry Benedict, father of the defendant Louie, about 1916, and he apparently obtained a patent for the land. He lived on the land and cultivated it to some extent up to the time of his death on July 24, 1924. He seemingly had given a mortgage against the land during his life time, the amount of which does not appear. His estate was probated. The decree settling the estate recites that the land was mortgaged for more than it was worth; that the mortgage had been due for some time and that it is for the interests of the estate to let it be foreclosed, and that there is no money with which to pay the taxes against the land. The record fails to show what became of the mortgage. The taxes for 1924 were not paid and this resulted in the sale of the land for taxes to one James B. Gibson. The latter assigned the certificate which he received to James Curtis Baughn, and a tax deed was issued to the latter on July 11, 1928. This tax deed is said to be invalid by the parties hereto as will be mentioned more fully hereafter. However, Baughn went into possession of the land

under his tax deed some time in the early part of 1929. He moved a house onto the land, built a log barn, and cultivated about sixty acres of land in the West Half of the West Half of Section 13, and used the Southwest Quarter of Section 12 for pasture. There is no controversy in this case as to the fact of adverse possession as long as he was on the land. On March 29, 1930 he gave a mortgage for $500.00 on the land to Antoine Bruch, father of the plaintiff herein. He raised, as is stated, but one good crop on the land from 1929 to 1934. In the latter year the crops did not come up, and about June 1, 1934, he left the place in disgust. The fact of his leaving is the main point in controversy here, and is claimed by the defendant to have interrupted the continuous adverse possession of the land. On October 16, 1934 he gave a warranty deed to the land to the plaintiff, Pauline Bruch, and in accordance with the agreement of the parties, he also moved the house from the premises in the month of December, 1934. The mortgage on the premises, too, was to be released when the plaintiff received her warranty deed. She immediately tried to find a tenant for the land but did not succeed in doing so until February 15, 1935. She then leased the land by written lease to Fred Hageman, who, as her tenant, has been in continuous possession of the land ever since.

It seems that the defendant, Louie R. Benedict, claims only a one-half undivided interest in the land hereinabove mentioned, as heir of Henry Benedict, the other undivided one-half belonging, according to him, to the widow of Henry Benedict, whose rights, however, are not in controversy in this case. Other, and in some instances detailed, fact will be set forth hereinafter.

I. DEFECT IN PETITION.

It is contended by Counsel for defendant that the

petition does not state a cause of action, in that it fails to allege that the plaintiff was in possession of the premises in controversy at the time of the commencement of the action. The point was not raised in the Court below, but Counsel rely on the fact that if the petition fails to state a cause of action, it may be raised for the first time in this Court under § 89-1008 Rev. Statutes 1931. The petition states that the plaintiff and her predecessors "have been" in continuous possession for ten years prior to the commencement of the action. The expression is in the past tense, and yet giving the pleading a liberal construction, as we must, it is probable that we should construe it as referring to the time immediately preceding, and as including the time of the commencement of the action. If that is not correct, then we think the defect was supplied by the answer in which the defendant states in Paragraph III thereof, that the plaintiff keeps the defendant out of the possession of the property. This can mean nothing else than that plaintiff was then in possession of the premises. That the petition may be aided by the answer has previously been held by this Court. Sowers v. King, 32 Wyo. 167, 231 Pac. 411, 238 Pac. 540; Church vs. Blakesley, 39 Wyo. 434, 273 Pac. 541. Furthermore, plaintiff in her reply states that plaintiff and her predecessors have been in continuous possession ever since July 11, 1928. Many cases hold that a defect in the petition may be cured by an allegation in the reply, 49 C. J. 863. Again, it is said in 51 C. J. 187-188: "The objection that plaintiff in a suit to quiet title is not in possession may be waived. Such waiver results where the objection is not taken by demurrer, plea or answer, or where, after demurrer on this ground is overruled, defendant answers on the merits. Defendant likewise waives the objection where he asks for affirmative relief, or stipulates for the trial of the cause before a master." Taking all the facts into consideration, we

think that the contention here made should be over-ruled.

## II.   FINDING OF FACTS AND CONCLUSIONS OF LAW.

At the conclusion of the testimony and before argument Counsel for the defendant asked the Court to make findings of fact and conclusions of law. This request was renewed at the end of the argument and before the submission of the case. The Court refused to comply with the request on the ground that it came too late. It would seem that the request was made in time, at least in the absence of a rule of Court to the contrary. 64 C. J. 1238, § 1082. First National Bank of Sheridan vs. Citizens State Bank, 11 Wyo. 32, 70 Pac. 726, 100 Am. St. Rep. 625—citing the case of Ross vs. Barker, 58 Neb. 402, 78 N. W. 730. The refusal to make such findings and conclusions is assigned as error herein. The request was made pursuant to § 89-1321 of the Rev. Statutes 1931, reading as follows:

"Upon the trial of question of fact by the Court, it shall not be necessary for the Court to state its findings, except, generally, for the plaintiff or defendant, unless one of the parties request it, with the view of excepting to the decision of the Court upon the questions of law involved in the trial, in which case the Court shall state in writing the conclusions of fact found separately from the conclusions of law."

Counsel for defendant have cited us to many cases which hold refusal to comply with the request, if timely made, to be reversible error. See also 5 C. J. S. 1197, and subsequent pages. Our statute was taken from Ohio. In Oliver vs. Moore, 23 Ohio State 473, the Court held that non-compliance with the provision would not result in a reversal if the record before the Appellate Court shows that it is without prejudice. In Oxford Township vs. Columbia, 38 Ohio State 87, 94, the Court held that the statute is not merely directory but that when the record in the Appellate Court contains all the

evidence, and an objection is made that the judgment is against the weight of the evidence the Appellate Court necessarily has to pass on the objection, and if, in fact, the objection is not well taken the case will not be reversed on account of non-compliance with the statute. These decisions were followed in Hilliard vs. Douglas Oil Fields, 20 Wyo. 201, 122 Pac. 626, 628, and in Cottonwood Sheep Company vs. Murphy, 48 Wyo. 250, 44 Pac. (2nd) 1000, and see Bank of Commerce vs. Williams, 52 Wyo. 1, 69 Pac. (2nd) 525, 535. In Grant vs. City Trust & Savings Bank, 11 Ohio Opinions 3 (Ohio App.), 46 N. E. (2nd) 453, the Court in reviewing the former Ohio cases stated, referring to § 11421-2 of the General Code which is the same as our § 89-1321, supra, as follows:

"The purpose of § 11421-2 of the General Code is to provide an opportunity for the aggrieved party to prosecute error without resorting to the securing of a bill of exceptions. In this case we have before us the bill of exceptions and all the evidence introduced in the lower court. We therefore hold that there was no error committed by the Trial Court in this regard. If no bill of exceptions were before us, another question would be presented for consideration and determination."

The latest pronouncement on the point in question by the Supreme Court of Ohio is in the case of Bauer vs. Cleveland Railway Company, 141 Ohio State 197, 47 N. E. (2nd) 225, where the Court said: "This statute confers a substantial right, is mandatory in character, and a refusal of the court in a proper case to comply with the request provided for therein is reversible error unless it appears from the record that the party making the request is not prejudiced by such refusal. Oxford Tp. vs. Columbia, 38 Ohio St. 87; Cleveland Produce Co. vs. Dennert, 104 Ohio St. 149, 135 N. E. 531." In Cook vs. Cortright, 68 Ohio App. 75, 39 N. E. (2nd) 210, it appears that the Trial Court refused the request of Counsel for a finding of facts and con-

clusions of law. The sole question presented to the Appellate Court was whether or not this was error. The Court held that it was, and reversed the judgment and sent the case back for a new trial. In the case at bar all the evidence taken in the Trial Court has been brought up for review in this Court. Error has been assigned that the judgment is not sustained by sufficient evidence, and that it is contrary to law. We must necessarily pass upon that question.

Aside from that Counsel for defendant have voluntarily inserted in the record on appeal the opinion of the trial court. If we may consult that opinion (See 4 C. J. S. 1209, § 734), it appears that the Trial Court found against the defendant on every material point in issue in this case. Counsel for the defendant did not see fit to submit to the Court, as it would have been advisable to do, the facts which they desired the Court to find. The ultimate fact required in this case would seem to be as to whether or not the plaintiff had adverse possession of the land, with its requisite elements, for the period of ten years. See 2 C. J. S. 872. The Court found that fact informally. If it had found it somewhat more formally, as requested by Counsel, we have no doubt that we should then have had before us the contention that such finding was not supported by the evidence. So we would have had the same question before us as we have now except in a slightly different form. It is clear, then, we think, that, following our former decisions, the refusal heretofore mentioned was without prejudice. We do not, of course, mean to intimate that § 89-1321, supra, may be ignored with impunity, and that it is a dead letter. The refusal to comply therewith might, in the proper case, lead to a reversal or other proper order. That might be true if the only question presented to this Court would be as to whether or not refusal of such compliance was error. See further on the subject Cleveland Produce Co. vs.

Dennert, 104 Ohio State 149, 135 N. E. 531; Graver vs. Trust Co., 29 Ohio App. 233; State ex rel vs. Beightler, 38 Ohio Law Abstract 615; Bloom vs. Rabkin, 19 Ohio App. 23.

III. ADMISSION OF TAX DEED IN EVIDENCE.

It is contended that the Court erred, in admitting the tax deed issued to Baughn in evidence, for the reason that it is void on its face, and it seems further to be contended that it does not describe the property. The deed describing the land herein involved recites that it was subject to taxation for the year 1924; that the taxes assessed against the land remained unpaid; that it was duly sold for taxes on July 10, 1925, and "whereas, at the time and place aforesaid, James B. Gibson * * * having offered to pay the sum of $43.45, being the whole amount of taxes, interest and costs then due and remaining unpaid on said property for the year 1924, which was the least quantity bid for, and payment of said sum having been made by him to said treasurer, the said property was stricken off to him at that price", and, whereas, the certificate of sale was assigned to James Curtis Baughn, "now, therefore, I, Richard Swormstedt, Treasurer of the County aforesaid * * *, have granted, bargained and sold, and by these presents do grant, bargain and sell unto said James Curtis Baughn * * * the real property last hereinabove described, to have and to hold", etc.

Sec. 115-2337, Rev. Statutes 1931, indicates that the deed was wrong in stating "year 1924", last above mentioned, and that instead the description of the property actually sold for taxes should have been inserted in that place. Several cases from other states have been cited in which the omission of the description of the land at that place has been held fatal, making the tax deed void on its face unless it appears that all of the land was sold for the taxes. Counsel for plaintiff does not

controvert that contention, and for the purposes of this case, but specifically reserving a decision thereon, we shall assume that the deed is void upon its face. Counsel for the defendant draw the conclusion that the deed should not have been admitted in evidence. They cite us to Denny vs. Stevens, 52 Wyo. 253, 73 Pac. (2nd) 308, and Matthews vs. Blake, 16 Wyo. 116, 92 Pac. 242, in which we held that the short statute of limitations in which a man relies upon a tax title is not set in motion when the tax deed is void upon its face. The statute is § 115-309, Rev. Statutes 1931, which reads: "No action for the recovery of real property sold for non-payment of taxes shall be maintained unless the same be brought within six years after the date of sale for taxes aforesaid." A number of cases from other states, holding similarly, are cited. However, Counsel for plaintiff does not, in this Court, rely upon the short statute of limitations, but relies upon adverse possession for the ordinary prescriptive period of ten years, so that the point above mentioned is not material herein.

Counsel for defendant further contend that the granting clause in the deed does not purport to convey any property, in view of the fact that no land is described where the above words "year 1924" were inserted, and that hence the deed was not admissible in evidence. They cite in support thereof, the case of McDonough vs. Marten, 33 Kans. 120, 35 Pac. 1117. In that case the Court stated, considering a deed like the one in the case at bar, that the description in the granting clause was at least vague and uncertain. The circumstances herein indicate that the taxing authorities assessed the land, after execution of the deed, to Baughn and his successor in interest. They evidently considered the description plain enough. There is but one description of the land, namely at the beginning of the deed, and the granting clause states that it con-

veys the property "last hereinabove described". We hardly think that we should be as technical in considering the description as was the Kansas case in McDonough vs. Marten, supra, and we do not see why we should disagree with the taxing authorities of Converse County and hold that the granting clause contains no description. It is not necessary to determine herein as to whether or not the deed is a sufficient color of title. See on that subject 4 Tiffany on Real Property (3rd Ed.), § 1155. A claim of title is sufficient in this state, for the purpose of initiating adverse possession, City of Rock Springs vs. Sturm, 39 Wyo. 494, 273 Pac. 908. The question of constructive possession does not appear in controversy herein. If there was in fact adverse possession for the requisite period, it would seem to be conceded that it was so as to all the land in controversy herein.

The question then remains as to whether or not the deed, considering that the granting clause did in fact contain a description of the land purported to be conveyed, was admissible for any purpose in this case. It is stated in 2 C. J. S. 591, that a void or worthless deed may be sufficient to show the hostile character of the possession or the date on which adverse possession began. In Horsky vs. McKennan, 53 Mont. 50, 162 Pac. 376, 380, one of the cases cited to us by Counsel for the defendant, the Court stated that: "While these deeds, being void on their face, were ineffectual to constitute title, they were evidence of a claim of title ample to sustain a possessio pedia * * *, if not, as some authorities insist, color of title sufficient under the General Statutes of Limitation, to support adverse possession of the land adequately described." In Philbin vs. Carr, 75 Ind. App. 560, 129 N. E. 19-25, the Court stated:

"It has been said that a void or worthless deed has always been received for another purpose, viz., as evi-

dence that the occupant claims for himself; that his occupancy is under a claim of right. In other words, that his possession is adverse. Pillow v. Roberts, 13 How. (U. S.) 472, 14 L. Ed. 228. That is all very true. But the fact that the possession has been adverse may be shown also by spoken words—as in cases of parol gifts or attempted parol conveyances — by a continuing course of conduct, and by any relevant facts. Therefore when a void deed is received in evidence solely for this purpose its admissibility does not rest on the ground that it constitutes color of title, but rather on the ground that it is a circumstance tending to show that the possession has not been that of a mere trespasser, or that of a lessee, or that it has been in any manner subservient to the owner of the legal title, but at all times has been under a claim of ownership or claim of title."

It would accordingly seem that the deed was admissible at least for a limited purpose and its admission in evidence was not accordingly error. Counsel state that the Court should have limited the purpose for which the deed was admitted. They cite: Byrne vs. Byrne, 113 Calif. 294, 45 Pac. 536. In that case the Court was asked to limit the purpose for which the evidence was admitted. No such request was made in the case at bar. Moreover, since the case was tried to the Court without jury, we think that even if the deed was not admissible in evidence its admission was without prejudice. Miracle vs. Barker, 59 Wyo. 92; 136 Pac. (2nd) 678, and numerous authorities cited.

IV.  HOSTILE HOLDING.

Counsel for defendant contend that Baughn did not hold the land adversely, that is to say hostilely. They put Baughn on the witness stand for the purpose of proving that fact. It may be gathered from the record that about 1930 the witness was informed that the tax title under which he had taken possession was defective. He was asked whether or not he had formed any

intention as to what he would do if the owner should return within a certain time and should endeavor to redeem the land. He said that he had formed some intention at some time during the year 1930. "Q. What was that intention? Do you understand my question? A. Yes, but I don't know how to answer it—I can try. Q. Yes, all right, try. A. That if the original owner came back to redeem his place and paid me what I was out, nothing I could do but give it to him. Q. If the owner came back and offered to do that what would you intend to do? A. I thought there was nothing else I could do; let him have it." The testimony, in substance, was a legal conclusion that his tax title was invalid. If it was, the owner had, of course, just as the witness stated, the right to redeem, leaving the witness no alternative except to permit the owner to do so. It may be noted that the willingness to let the owner redeem was conditioned upon re-payment of the amount which the witness had paid out. This condition was never complied with. The subject here under consideration is treated at considerable length in 2 C. J. S. 710-714, and Tiffany on Real Property (3rd Ed.), Vol. 4, §§ 1142-1144; § 1163. It appears from the authorities that knowledge of defect of title is not sufficient to destroy the adverse nature of possession. Montgomery & Mullen Lumber Co. vs. Quimby, 164 Calif. 250, 128 Pac. 402, 404, and cases cited; Goodrich vs. Mortimer, 44 Calif. App. 576, 186 Pac. 844. So it has been held that a statement by the adverse possessor that the property does not belong to him does not interrupt the claimant's adverse possession in the face of his open, notorious possession and use of the property. Crossman vs. Foster, 44 Ohio App. 78, 183 N. E. 925. In McIntosh vs. Kolb, 112 S. C. 1, 99 S. E. 356, it was held that an erroneous expression on a matter of law would not affect the running of the statute. It would seem that an expression on a matter of law, even though correct,

would have the same effect if not accompanied by other facts or circumstances showing that the holder actually holds in subordination to the title of the real owner. In City of Rock Springs vs. Sturm, supra, we cited a number of cases decided in England, and we expressed the opinion that: "It would seem, under the English Act (of Limitation) that if actual possession is held by anyone and he does not, during the statutory period, recognize the rights of the true owner, either in writing or by payment of rent, such possession ripens into title." The view of the Supreme Court of Ohio in McAllister vs. Hartzell, 60 Ohio 69, 53 N. E. 715, seems very similar. In that case the Court approved the statement in Drayton vs. Marshall, 1 Rice Eq. (S. C.) 373, in which it was said that: "It is believed that no case can be put, in which a man knows that another claims, and is in enjoyment of what belongs to him, and neglects to prosecute his claim at law, where there is nothing to prevent his doing so, that he will not be barred by statute." The Supreme Court of Ohio in the McAllister case, supra, further commenting on that statement stated in part:

"We are of opinion that the principle announced in Drayton vs. Marshall, supra, is a just one, that it is applicable to the facts of this case, and that the rule should be that where it is shown that the original seizure was a disseisin, no subsequent act or declaration of the claimant should be held to toll the statute which does not deprive the holder of the title of his right to prosecute his action to recover possession, or suspend the same. This is a simple, easily understood test, and we believe is not only within the letter, but clearly within the spirit, of the statute. Applying this rule to the case at bar it is clear that neither the mere offer to buy, nor the acknowledgment of the claimant that the title was in another, or that he did not own the land, is sufficient to suspend the running of the state. Such acts and declarations raise no conclusive implication that the claimant intends to attorn to the holder of the title, or yield the possession."

In Farmers' & Mechanics' Bank vs. Wilson, 10 Watts 261, the Supreme Court of Pennsylvania held that an acknowledgment of title must be made to the owner or his agent in order to affect adverse possession. The Court stated in part: "To put a defendant out of its protection (that of the statutes of limitation) both claimant and the defendant must distinctly understand, that defendant not only supposed plaintiff's title good, but also agreed to deliver possession to plaintiff or to hold under him thereafter, to become a tenant and nothing short of this—no loose conversations—no inferences from what was said many years ago—no expression to neighbors or strangers to the title, will act to deprive a man of the protection of this most wise and beneficial statute." There are cases which held that acknowledgment of the title of the owner, made to others, will be sufficient to bar the claim of the adverse possessor. 2 C. J. S. 711. Commenting on these cases, Tiffany, supra, § 1163, states:

"There are occasional decisions or dicta to the effect that the possessor's recognition of the title of the rightful owner is effective for the purpose of negativing the element of hostility although it is communicated, not to the rightful owner himself, but to some third person or persons, but the soundness of such a view is, it is submitted, open to question. One who takes possession of another's land without permission from the owner is guilty of a tort regardless of the fact that he concedes the other's title, and such other should be excused from the obligation of asserting his title within the statutory period only when the possessor acknowledges his title by direct communication, and the latter is thereby induced to refrain from asserting his title."

The same author in § 1144 states that: "Knowing or having reason to know, that his land is in the possession of another, the true owner should be barred by reason of his laches in asserting his own right of possession unless he can show that he was induced so to

do by possessor's recognition and admission of his rights." The case at bar is somewhat different from any cases we have found. So far as the record shows the so-called intention or idea formed by Baughn of having to deliver possession if the owner appeared and redeemed, appears to have remained a profound secret locked in the recesses of his breast until the trial of this case. No statement thereof to the owner or to the plaintiff who bought from him for value, or to anyone else appears in the record. About the time that he formed the above mentioned intention or idea, he gave a mortgage for $500.00 to plaintiff's father. We can hardly assume that he gave it with the intention to defraud the mortgagee. He paid, during the year 1930 and other years, the taxes on the land and "the payment by him of taxes upon the land has been regarded as evidence that the possession is adverse." Tiffany, supra, § 1143. Taking all the facts into consideration we do not believe, without necessarily approving all the authorities above mentioned, that the so-called intention of Baughn should be considered seriously.

## V. USE BY HAGEMAN.

Mr. Hageman leased the land from the plaintiff by written lease on February 15, 1935. He then took possession, and he has been in possession of the land as tenant of plaintiff ever since. Counsel for defendant seem to contend that his use of the land was not such as to show adverse possession. He built a reservoir on the West Half of the West Half in question in 1938, and another reservoir on the Southwest Quarter in question in 1941. He repaired some fences which were out of repair when he obtained the lease. Just what time he did so is not clear from the record. Some cattle of a man by the name of Howard were getting through the fences when Hageman received the lease, and we gather from Hageman's testimony that the fences were re-

paired soon after that, and Howard's cattle did no longer get through. There is some conflict in the testimony but the following appears: Q. How many years under the terms of the lease or similar terms, have you occupied the land, and for what purpose? A. I have had it continuously, and have used it continuously for raising stock * * *; I have used it for grazing. Q. Have you kept the fences in repair? A. Yes. Q. Have you kept other persons off the land? A. Yes. Q. Has there been anybody occupying the land with you? A. No." Counsel argue that, in the nature of things, he was unable to keep the animals of others off the land until he built his reservoirs and fenced the so-called Nieman land—the exact location of which is not clear from the record. We think that whatever conflict there was in the testimony was for the Trial Court to resolve. It is quite clear from the record that the land was adapted mainly for grazing. Tiffany, supra, § 1162, states that: "If, because of its character and location, but slight use can be made of the land, such slight use is sufficient" for the purpose of adverse possession. Hageman was never ousted from possession of the premises. The straying of cattle onto the land while he held it—the extent of which is by no means clear—did not have the effect of an ouster, at least to the extent that we can say as a matter of law that the Trial Court should have held that there was an interruption of adverse possession. See the authorities hereinafter mentioned.

VI. INTERRUPTION BY THIRD PERSON.

It is contended that there was an interruption in adverse possession by reason of the use of the land in question by various parties after Baughn left the land and before Hageman took possession. The evidence is quite clear and undisputed that, while Baughn was on the land he kept the fences in reasonably good condition, but they became out of repair after he left, and

this appears to be due to some extent because others intentionally took part of them. The witness Crawford testified at length and stated that some of his cattle ranged over the land in question. This, however, was denied by the witness Hageman; Crawford admitted that he claimed no right to graze his cattle on the land. The witness Hall, too, stated that some of his cattle grazed on the land in dispute here, but he also disclaimed any right thereto. The testimony of the witness Reese is somewhat different. He was asked: "Would you tell the Court briefly to what extent the cattle of anybody else ranged over these lands?" He answered: "As far as the Benedict land goes I don't think it amounted to much; it was in the summer time and there wasn't any water there, but they came down on my land and really were not my neighbor's cattle." This testimony should be considered in connection with the testimony of Hageman, some of which has already been quoted.

The main interruption of continuous possession by third parties is claimed to be through the witness Reese, who stated that he leased the land in the fall of 1934 from a person by the name of May who occupied the land immediately to the west of the West Half of the West Half involved herein. The witness testified that he paid May the sum of Twenty Dollars ($20.00) for the grass, and that he used the West Half of the West Half for cattle and sheep. He apparently at once disclaimed any right under his lease after he learned that Hageman had leased the land. No controversy between them seems to have arisen. The witness testified that: "May claimed that he had a lease from Baughn." That is important, for it shows that the occupancy of the land by Reese was not adverse to Baughn, but was under the latter, at least insofar as the intention of the parties was concerned. In Love vs. Turner, 78 S. C. 513, 59 S. E. 529, the court said: "The intrusion of a

trespasser will, in no case, interrupt the continuity of adverse possession, unless continued for such length of time that knowledge of the intrusion is presumed, or so as to become the assertion of an adverse right." Tiffany, supra, § 1162, states: "Nor is the continuity of possession interrupted by the entry of a third person upon the land, not effecting an ouster of the person previously in possession, such entry constitutes merely a trespass upon such person's possession." In 2 C. J. S. 706, it is stated: "The continuity of an adverse occupant's possession will not be interrupted by entries, trespasses or intrusion by strangers where they are merely casual, occasional, intermittent, temporary or isolated, for the mere circumstance of the entry of another does not dispossess an adverse occupant." See similar in effect, 1 Am. Jur. 890, and note 22 A. L. R. 1458; Zellmer vs. Martin, 157 Wisc. 341, 147 N. W. 371. See also note Ann. Cas. 1916A 610, where it is stated: "But a mere temporary removal of the enclosure or temporary breaks therein do not evidence an abandonment which will interrupt continuity of the claimant's possession."

We do not think that, under these authorities, we can say that the Trial Court should have held that the adverse possession of Baughn or of plaintiff was interrupted by the parties above mentioned. It is quite clear that no one intended to oust Baughn or the plaintiff from possession, and no one in fact did so. The possession of Reese was brief and evidently in subservience of that of Baughn and his successor in interest. Some cattle, perhaps, strayed onto the land from time to time but they in no way hindered Baughn, the plaintiff or Hageman in their possession of the land, at least not sufficiently so that we could say, as a matter of law, that there was an ouster by them.

## VII. ABANDONMENT.

As already stated, it appears herein that Baughn left the premises in controversy in June, 1934, because of a total failure of crops and because he had to make a living elsewhere. He felt that it would be useless to continue trying to raise a crop on the land. On October 16, 1934, he deeded the land to the plaintiff, Pauline Bruch, by warranty deed, the consideration being the cancellation of the mortgage held by Antoine Bruch, and the removal of the house on the premises by Baughn. The plaintiff thereupon attempted to find a lease for the premises but did not succeed until February 15, 1935, at which time, as heretofore stated, Hageman took possession under his lease. It is contended for the defendant that the absence of Baughn from the premises interrupted the period of continuous possession, and that since this action was commenced July 22, 1944, the requisite period barring the defendant from recovering the property has not elapsed, in contemplation of § 89-406, Rev. Statutes 1931, which provides that: "An action for the recovery of the title or possession of lands, tenements or hereditaments can only be brought within ten years after the cause of action accrues." The contention is that the action in favor of the plaintiff did not accrue at least until February 15, 1935, when Hageman took possession. This contention appears to be the main point involved in this case. In order to uphold it we must be able to say that the evidence in the case is such that only one reasonable conclusion can be drawn therefrom. That point, frequently presented to us, is, as Counsel know, often one of difficulty, especially in view of the rule of law that "if evidence is conflicting or there is evidence to sustain the finding, the Appellate Court will not interfere unless the finding is clearly erroneous, or so clearly

against the evidence or the greater weight of the evidence as to be manfestly wrong." 5 C. J. S. 562.

Certain rules seem to be well established. Thus it is said in a note to Ann. Cas. 1916A 607: "It is generally recognized that a temporary break or interruption, not of unreasonable duration, does not destroy the continuity of the adverse claimant's possession", and on page 608 of the same volume it is stated that: "The operation of the statute of limitations is not affected by a temporary and reasonable vacancy of the premises occurring between the time of a conveyance thereof by the adverse holder and the entry into possession of the vendee or his tenant." These rules are also stated in 2 C. J. S. 730-731. A number of cases with a brief statement of the facts are collected in the notes to Hardy vs. Bumpstead, 76 A.| L. R. 1488, (Tex. Comm. App., 41 S. W. 2nd 226), and in the notes in Ann. Cas. 1916A 606, et. seq. It appears therefrom that, while the principles of law are not in dispute, the Courts have not applied the law to the facts in the same manner. It would not subserve any good purpose to review the cases at length, since the facts in the various cases differ. Tiffany, supra, § 1162, states that: "Interruption of continuity of possession may result from the cessation by the person in possession of his exercise of acts of possession or ownership over the land, but the mere fact that the acts of possession are not continuous or that the owner does not continue in actual occupancy, does not necessarily show an interruption of the possession, this depending on the character of the acts necessary to constitute actual possession, the intention of the possessor and the other circumstances of the case." In Bradbury vs. Dumond, 80 Ark. 82, 96 S. W. 390, 11 L. R. A. (N. S.) 772, in which it appears that the fences were in about the same condition as in the case at bar, the Court stated: "The continuity of the possession was not broken by a failure to have tenants for a year. The pro-

perty was not abandoned. It only fell into a sorry state of repair, which was necessarily incident to its tenant-less condition. The cleared fields, the houses, the fences, even if broken down in places, kept the flag of possession flying." In Peace vs. Whitney, 73 N. H. 201, 98 Atl. 62, 65, the Court stated: "It is obvious from the general principles of adverse possession that a temporary absence from the land, which under the circumstances is reasonable, does not as a matter of law interrupt the necessary continuity of possession. The effect of such absence upon that subject is ordinarily a question of fact and not of law. It may be longer or shorter, according to its reasonableness. Its actual duration is fixed by no general rule of law."

It may not be without interest to note the view of the Supreme Court of Vermont in Patchin vs. Stroud, 28 Vt. 384, in which the Court stated:

"The simple question raised on the bill of exceptions seems to be this, (and it is the only one which we are called upon to revise,) and that is whether, in a case resting upon prior possession, if fifteen years or more intervene between any of the acts of possession, does that per se, and as matter of law, constitute an effect-ual bar against the plaintiff from availing himelf of the first acts of possession, even though the jury should find that in the meantime there had been no actual abandonment of the first possession. We apprehend it must always be a question of fact, whether a prior possession has been abandoned or not. Lapse of time, whether it be somewhat less or more than fifteen years, might go to the jury, as furnishing some evidence to prove an abandonment, but the weight of it would be to be judged of by the jury under the circumstances of each particular case, and if, on the whole, a presumption is to be drawn of an abandonment, it is a presumption of fact and not of law."

In Langdon vs. Templeton, 66 Vt. 173, 28 Atl. 866, the Court stated: "The fact that the orator had done no act upon the lot for nearly thirteen years next before the

defendant's entry, does not of itself and as matter of law constitute an abandonment of the possession he had formerly had. Whether a prior possession has been abandoned or not is a question of fact, to be determined from the circumstances of the case." See also Chase vs. Eddy, 88 Vt. 235, 92 Atl. 99. If these cases from Vermont are correct it is apparent that only in exceptional cases can an Appellate Court say that continuous possession has been interrupted as a matter of law. We need not say whether or not these cases go too far, for the periods involved in the case at bar were comparatively short. We are hardly warranted in holding, as a matter of law, that they were unreasonably long.

In Ovig vs. Morrison, 142 Wisc. 243, 125 N. W. 449, it is stated: "It is an elementary rule that where adverse possession of land has once been fully established, occasional absences or intervals of there being no person residing on the premises, such circumstances not being of a character to evidence abandonment, and there being no actual interruption by re-entry of the person originally dispossessed, do not change the nature of the adverse possession." From this case it may be noted that one element to be considered as to whether a temporary absence will break the continuity of the possession is as to whether or not the person claiming to be the true owner, or perhaps someone else, enters upon and takes possession of the land during such temporary absence. Indeed some cases seem to hold that this fact is not only an element to be considered but is rather persuasive. It was said in Clements vs. Lampkin, 34 Ark. 598, 602: "The possession of Topp's vendee, once established by material acts of visible, notorious ownership, which was done by putting negroes upon it * * * must be presumed to have continued, until open, notorious and adverse possession be shown to have been taken by another." In Stettinische vs. Lamb, 18 Neb. 619, it appears that the prem-

ises were left vacant on several occasions, in one instance extending over a period of some months. The Court stated in part:

"Where a party erects a building on a lot, and takes actual possession of the same as his own, the fact that afterwards he, or those claiming under him, rent the property, or, in case it is unoccupied, have and claim the right to the possession of the same where there is no abandonment, is not an interruption to the possession. De La Vega v. Butler, 47 Texas, 529. The reason is, the building at least belongs to the claimant. He may use it in any manner he sees fit; and so long as no one enters into possession thereof claiming adversely to him his possession is not interrupted; and possession being once established in Mrs. Towle by the erection of a building on the lot in question, and taking possession of the same, such possession will be presumed to have continued until an interruption therein is proved. Rayner vs. Lee, 20 Mich., 384. Clements vs. Lampkin, 34 Ark., 598."

In Downing vs. Mayes, 153 Ill. 330, 38 N. E. 620, 46 Am. St. Rep. 896, it appears that the premises held under adverse possession were vacant from the fall of 1884 to the spring of 1886. The adverse claimant attempted to find tenants, but during the period above mentioned was unable to do so. No intention to abandon was shown. Particularly in view of the fact that in the case at bar the defendant paid no attention to the land for twenty years, it is interesting to note what the Court said in the foregoing case, namely, as follows:

"During the year 1885, and down to the spring of 1886, the improvements made by the Stricklands all remained on the land. The house had been damaged somewhat by hunters, but it remained on the land. The fence put upon the land to enclose it still remained. The possession of the Stricklands had not been disturbed. No person attempted to enter upon the land or invade the possession of the widow and heirs of Strickland. We think, therefore, that down to the spring of 1886 the

widow and heirs of Strickland were in the possession of the land, although they were not on the land in person, and did not have a tenant thereon. Suppose a person owns a tract consisting of forty acres of land. He encloses the land with a fence, erects a house, and resides upon the land for several years. He finally concludes to change his residence, and moves to another place, but for some reason he is unable to procure a tenant. His house remains vacant for three or four years, and the land is not cultivated. Does the owner, from the fact he cannot find a tenant for his land, lose the possession? We think not. If the widow and heirs had abandoned the possession of the premises, or had some other party gone into the actual possession, under a claim of right, before the twenty years had expired, there might be good ground for holding that the complainants were not entitled to invoke the Statute of Limitations. But such was not the case. Newman, the owner of the title, lived until 1880, and while he knew that the Stricklands were in the possession of the land claiming to own it, he never, so far as appears, set up any claim to the land, nor did his heirs set up any claim after his death. On the other hand, the Stricklands were allowed to hold the possession of the land for over twenty years, without objection from any quarter. Under the facts, we think it is plain that the decree of the court in favor of the Stricklands was correct."

In Cathcart vs. Matthews, 105 S. C. 329, 89 S. E. 1021, it appears that there were two breaks in the possession of the adverse claimant. The Court stated: "The rule requiring continuity of possession does not mean that the person in possession, his tenant or agent, must be actually on the land during the whole of the statutory period. Actual possession, once taken, will continue, though the party taking such possession should not continue to rest with his foot upon the soil, until he be disseized, or until he do some act which amounts to a voluntary abandonment of the possession." In Pease vs. Whitney, 78 N. H. 201, 98 Atl. 21, the Court approved the following instruction which had been given to the jury: "Temporary absence, un-

less taken advantage of by the other side so as to repossess themselves of the property, does not, as a matter of law, bar the plaintiff from that continuation of possession necessary in order to acquire title by prescription. The possession once taken may be assumed to continue until dispossession is shown, or sufficient absence so that an abandonment may be reasonably inferred." In Blume vs. MacGregor, 64 Calif. App. (2nd) 244, 148 Pac. (2nd) 656, 664, the Court said that: "The fact that the buildings in some instances may not be occupied continuously after their completion, would not, standing alone, destroy the continuity of the possession so long as there was no intrusion by any other person upon the land disturbance of the claimants' possession thereof." See further as to presumption of continuance of possession, 1 C. J. S. 825 (4).

It would seem from these authorities that, if no facts other than those heretofore mentioned, appeared in the case, we would not be justified in holding that the Trial Court was compelled, as a matter of law, to hold that possession was not continuous as the law requires. Counsel for the defendant, however, contend that the evidence in this case clearly shows that Baughn abandoned the property. Interruption of adverse possession is often treated as though synonymous with abandonment of possession. See for example, 2 C. J. S. 865 (4). The terms, however, are not quite synonymous. There may be an interruption of possession, for instance, by an action in Court or entry by the former owner, without abandonment on the part of the claimant. Under the facts in this case, however, the terms may be treated as synonymous. Counsel for defendant rely upon the testimony of Baughn, grantor of the plaintiff. He testified, as already heretofore stated, that the crops in 1934 failed, and that he could not make a living on the land and had to work out; that, accordingly, about June 1, 1934, he moved all of his personal property ex-

cept the feed grinder, off the land and took some of the property to the place of his wife's mother, about six miles away, and his household goods to Nebraska. It does not appear how long he was in Nebraska, apparently not very long. He testified further on cross examination: "Q. What were your intentions at that time? Did you intend to live on the land any more? A. No. Q. Did you intend to return to the land? A. No, sir. Q. Did you intend to use it for any purpose? A. No. Q. Were you through with the land? A. Yes, sir. Q. Did you lease the land or return possession to anyone when you moved off? A. No. Q. Did you try to turn it to anyone or try to lease it to anyone? A. No. Q. Did you have any intention of leasing the land at that time? A. No. Q. You said you had no use whatsoever for the land from that time on? A. Yes, sir." He further testified that his father gave him some lots west of Manville; that he and his father talked the matter over about turning the land over to the plaintiff, saving her the expense of foreclosure of the mortgage held by her father if he could get the house and move it off the land; that, at his father's suggestion, he went to the plaintiff, which resulted in the deed being given to the latter on October 16, 1934, and that, pursuant to agreement with her, he moved the house off the land in December, 1934.

The foregoing testimony, of course, would indicate that Baughn abandoned the property, and this testimony is probably the main reason why the question of abandonment has been raised in this case. However, on re-direct examination ,Baughn's testimony is as follows: "Q. You said that when you moved off the land you were through with the land; what did you mean by that, that you would give the land to the next fellow who came along and wanted it or you were through trying to make a living there? A. That is true; I was through trying to make a living there. Q. You did not

mean you abandoned the land and gave it to anybody who wanted it? A. Oh, I would not give it away, no. Q. You still claimed ownership and possession, did you not? A. I figured as long as I had the deed I was still the owner."

Counsel for the plaintiff contends that this testimony, on re-direct examination, clearly shows that Baughn did not abandon ownership or possession of the land, and that he merely gave up trying to make a living on the land. He cites the statement in 1 Am. Jur. 7, § 9, that: "Abandonment consists of two elements, act and intention. The act of relinquishment of possession or enjoyment must be accompanied by an intent to part permanently with the right to the thing, otherwise there is no abandonment." Counsel for defendant, in their reply brief, assert that this rule has no application in the case at bar; that the rule so stated "has to do with abandonment of property *actually owned* and we feel we cannot emphasize too strongly that in June, 1934, Baughn *did not own* the land in question." (Italics are those of Counsel). Counsel seem to have entirely forgotten that in their main brief (Page 35), they state: "It is well established that the ownership of land, once acquired, cannot be lost by abandonment", citing 1 Am. Jur. 5. It is quite apparent, therefore, that in their reply brief they miscontrued the text cited by plaintiff, and take a position inconsistent with that in their main brief. In 1 Am. Jur. 887, under "Adverse Possession" it is stated that "to constitute sufficient abandonment in order to destroy the continuity of an adverse claimant's possession, there must be an intention to reliquish the claim of ownership." The statement is apparently based on cases which hold that "mere temporary absence from the property is not sufficient." The requisite of intention, while not directly stated in these cases, may be inferred. In Pease vs. Whitney, supra, the Court stated: "Whether the

plaintiff, at any time during the twenty year period renounced her claim to Lot C and abandoned it, while still remaining the owner of the rest of the farm, is principally a question of intention, which is a question of fact for the jury. And a mere interval in possession, though for several years, is not conclusive evidence of abandonment * * *. The very great improbability that the plaintiff would abandon her claim to a part of what she deemed to be her farm, which she believed was covered by her deed, is evidence that she did not intend to do so, because such an idea entertained by an owner of real estate is so strange and unusual as to demonstrate its absurdity." In Cathcart vs. Matthews, supra, the Court, in speaking of abandonment of land, held in adverse possession, states that: "Abandonment involves intention, and when the evidence is susceptible of more than one inference, the question of intent is one of fact for the jury." In Webb vs. Richardson, 42 Vt. 465, 473, the Court stated: "To constitute a continous possession it is not necessary that the occupant should be actually upon the premises continually. The mere fact that time intervenes between successive acts of occupany does not necessarily destroy the continuity of the possession. The kind and frequency of the acts of occupancy, necessary to constitute a continuous possession, depend somewhat on the condition of the property, and the uses to which it is adapted in reference to the circumstances and situation of the possessor, and partly on his intention." In Goodrich vs. Mortimer, 44 Calif. App. 576, 186 Pac. 844, 846, the Court stated that: "If the person in possession of land leaves it, with the intention of returning, he does not abandon it. Abandonment is a question of intention."

The situation in the case at bar is a peculiar one. Had the plaintiff waited for a few more months before bringing her action herein she would have had ten years adverse possession without tacking her posses-

sion to that of Baughn, her grantor. The plaintiff bought the land from Baughn for a valuable consideration. Suddenly, and doubtless unexpectedly, after the passing of a period of more than ten years, the plaintiff was confronted with the testimony of Baughn, her grantor, that he never intended to return and was through with the land. We are unable to gather from the record that he had ever communicated that express intention to the plaintiff when she bought the land, or for that matter, to anyone else. He seemingly kept that express intention locked within his own breast, just as he kept his intention locked within his breast that he intended to give up the property to the true owner. He may not have been a truly hostile witness, but it is apparent that he was perfectly willing that the plaintiff should lose the benefit of the valuable consideration which she paid him. Nor are we certain that the witness could truly portray his intentions of more than ten years ago. We have not found a situation such as that before us in the books and we must, necessarily, proceed cautiously in expressing our opinion. True, the acts of Baughn, when he left in June, 1934, were consistent with his intention to abandon the land. Whether, if the land was worth anything—and it seems to have been—it was natural or otherwise for him to leave the land with such intentions is another matter. See Pease vs. Whitney, supra. It is clear that his sale of the land to the plaintiff was inconsistent with any intention of abandonment, for such sale consisted of the highest kind of at least intended control and domination of the land. His solemn warranty of the title is irreconciliable with his evidence that he was "through with the land", and fully warranted the Trial Court in rejecting the testimony to that effect. It is true that every man is presumed to know the law, and everyone intending to buy any land should have the title examined, and we may, for the purpose of this opinion, concede that the

plaintiff tacked her possession to that of Baughn at her peril. At the same time we should not be asked to increase that peril any more than necessary. Hence, we think that the least we can say is that the Trial Court was not bound to give to Baughn's testimony, on redirect examination, an illiberal interpretation, but had the right to conclude that it negatived the intention to abandon the land or the possession thereof. It has been held, it is true, in a number of cases, that an intention alone, to hold or return, is not sufficient; that there must be evidence of adverse possession, and an adverse claimant must "keep his flag flying"; that he cannot release all control and domination over the land. 2 C. J. S. 710. We do not think that we can say, as a matter of law, that Baughn released all control. And with the intention to abandon negatived, as above mentioned, the conclusion herein is not, we think, unreasonable. No one went into possession adverse to Baughn or this plaintiff. They were not ousted. The fences were in good condition as Baughn testified, when he left in June; the state of cultivation during that year was still evident; there was a house and a log barn on the land, which did not belong to the defendant; Baughn then, according to Bradbury vs. Dumond, supra, kept his "flag flying." He exercised control and domination over the land when he sold it to the plaintiff, and warranted the title thereto. The latter tried at once to find a tenant and succeeded in doing so on February 15, 1935, when Hageman went into possession of the land as her tenant. Taking all the facts and circumstances into consideration, we think that, under the authorities heretofore cited, we would be wrong in holding, as a matter of law, that the Trial Court should have held that the property or the possession thereof were abandoned by Baughn or by the plaintiff. Finding no reversible error in the record, we should, accordingly,

affirm the judgment of the trial court, and it is so ordered.

RINER, J. and KIMBALL, J., Concur.