[Civ. No. 43086. Second Dist., Div. Five. Sept. 30, 1974.]

JOAQUIN G. LOBRO, Plaintiff, Cross-defendant and Appellant, v. CARRIE B. WATSON, Individually and as Administratrix, etc., Defendant, Cross-Complainant and Respondent.

## COUNSEL

William R. Freeman for Plaintiff, Cross-defendant and Appellant.

Anderson, Adams & Bacon and Myron R. Fisher for Defendant, Cross-complainant and Respondent.

## OPINION

**STEPHENS, Acting P. J.**—Plaintiff and cross-defendant Joaquin G. Lobro appeals from a judgment in favor of defendant and cross-complainant Carrie B. Watson, determining the latter to be the owner of a particular piece of realty in Los Angeles County, hereinafter referred to as Lot 14.

The litigation arose out of a quiet title action brought by plaintiff against Carrie Watson both in her individual capacity and in her capacity as administratrix of the estate of her former husband, Albert Cruz, and a cross-complaint by Carrie Watson in her individual capacity against the plaintiff, seeking like relief.

The facts that can be gleaned from the record show that Jesus and Severancia Cruz were the parents of Albert, Alexandria, Domingo, Mary (Silva), and Hortense (Lobro). In 1925, Albert married Carrie (now Carrie Watson) and they lived on the property in question from 1925 until 1930, when they moved to Chino, California. In 1931, the parents conveyed Lot 14 to Albert, reserving a life estate for themselves. Although the conveyance was recorded in 1931 at the specific request of Albert, neither he nor Carrie ever reoccupied the property after they moved from it in 1930. The trial court found that its existence was not known by

Carrie until she was informed of the property in 1969 by Mary Silva. This conveyance, however, was known within the Cruz family.[1]

Albert died intestate in 1938 and all of his estate was ordered distributed in probate proceedings. Lot 14 was not mentioned in the decree of distribution since it was not known as an asset of the estate at that time by the administratrix (Carrie Watson). Carrie had little or no further contact with the Cruz family after the death of Albert in 1938. However, she did know that persons other than the Lobros and Jesus Cruz rented the house and that her husband had never received the rental payments. Also, after Albert's death, Carrie saw Jesus and some (but not all) of the members of the Cruz family. She also knew that the Lobros lived in the house after the time she remarried and lived in Los Angeles.

Severancia predeceased Jesus, and Jesus died testate in 1944. His will left to Hortense all of his corporate stock and one-half of the remainder of his estate, which purportedly included Lot 14. Although the decree of distribution of his estate declared that Lot 14 was included among the other real property distributed, the trial court in this action found that Jesus had no disposable interest in the property remaining at the time of his death, having only reserved a life estate in his conveyance to Albert.

Hortense and her husband, Joaquin Lobro (both of whom were deaf mutes), were married in 1941, and shortly after Jesus' death in 1944, moved onto the property in question.[2] Mary Lobro, Joaquin's sister, testified that Hortense and Joaquin were "moved" onto the property by Mary Silva because the property that Hortense was to inherit from Jesus could not be located. She further testified that this action was approved by the executor of Jesus' estate. However, the Lobros had to redeem the property from a tax sale made to the State of California in 1948. After doing so, they lived there continuously until the death of Hortense in 1969. Joaquin continues to reside there. The trial court found that from 1944 to 1969,

---

[1]There is no evidence to indicate that the Cruz family ever attempted to conceal this conveyance from Carrie. In fact, Mary Silva, respondent's witness, testified to this effect. Nor is there any evidence to indicate why Albert never informed Carrie about the conveyance. However, Carrie was the sole intestate heir to the property and the administratrix of Albert's estate. After the distribution of the estate, Carrie moved away and remarried. Mary informed her of the conveyance to Albert in 1969. She found the property after a title search. There is no question that she would have similarly done so in 1938 had she exercised due diligence as administratrix by carrying out her duty of locating the assets of the deceased.

[2]The facts surrounding the Lobros were related by Joaquin's sister, Mary Lobro, who had personal knowledge of the circumstances.

the Lobros improved and made additions to the property, fenced the lot, replaced the roof, planted trees and flowers, all at their own expense, and paid all the taxes which were assessed to them. In 1950, however, Hortense told Mary Silva that Joaquin was declining to pay further taxes on the property because he had no evidence of title. She asked Mary for a deed to the property, and Mary agreed to give them one. As part of the agreement, Hortense signed a deed in 1950 purporting to convey Lot 14 to Mary, and on the same date Mary executed a deed re-conveying the property to Hortense and Joaquin as joint tenants. Both deeds were recorded at the request of the Lobros.

The trial court found that at the time of these transactions in 1950, Hortense knew Lot 14 was owned by Carrie and that neither Hortense nor Mary had any interest therein which could be conveyed between them. Certainly, at that time the Lobros held the property adversely to any other party. In addition, the trial court found that in or about 1946, and again in 1966, Hortense told Mary that she did not "think" Lot 14 belonged to her, but rather thought it had belonged to her brother (Albert), and during one such discussion, she asked Mary concerning Carrie's whereabouts.

In 1969, Carrie received a message from Mary to the effect that Lot 14 had been conveyed to Albert by his parents. As a result of this message, Carrie instituted a title search, which revealed the conveyance to Albert in 1931. However, Carrie testified that she knew that the Lobros were living on the property but had never been to the property or inquired as to its ownership since she left it in 1930.

Appellant contends that he is entitled to quiet title of Lot 14 by adverse possession. He asserts that (1) the trial court erred in determining that there was a fiduciary relationship between him and Carrie Watson; (2) the trial court erred in determining that the property had not been held hostilely or adversely to respondent Carrie Watson; (3) the trial court erred in holding that actual or constructive notice of respondent Carrie Watson's claim to ownership barred appellant from adversely possessing said property.

In its finding of fact No. 5 and conclusion of law No. 1, the trial court found and concluded that the decree of distribution of Albert's estate included after-discovered property.[3] (See Prob. Code, § 1067; *Heydenfeldt*

---

[3]Finding of fact No. 5, in pertinent part, states as follows: "In 1938, Albert died intestate. All of his estate, known and unknown, was ordered distributed, in pro-

v. *Osmont*, 178 Cal. 768, 773 [175 P. 1]; *Humphry* v. *Protestant etc. Church*, 154 Cal. 170, 172 [97 P. 187].) While this may be subject to some doubt, we are of the opinion that title to *all* of Albert's property vested automatically in Carrie Watson at the moment of Albert's death, subject only to the control of the probate court and the possession of the administratrix (Carrie) for purposes of administration of the estate. (*Johns* v. *Scobie*, 12 Cal.2d 618, 622 [86 P.2d 820, 121 A.L.R. 1404].) ■ It is well settled that one entitled to succession takes, not by virtue of the decree of distribution, but by the law of succession. Since Carrie was the sole intestate heir of Albert's estate, the decree of distribution to Carrie **did no more than declare title to property which vested at the moment** of Albert's death. The decree of distribution did not create such title. (*Schade* v. *Stewart*, 205 Cal. 658, 660-661 [272 P. 567].) In any event, we can proceed to determine the question of Carrie's rights to said property.

■ We agree with appellant's first contention, that there was no fiduciary relationship between him and Carrie Watson. The general rule is that where a close familial relationship exists between the owner and the claimant of property, the possession by the claimant will not be considered adverse to the owner in the absence of a clear showing of the assertion of a hostile claim *and* actual or constructive notice. (*Brown* v. *McKay*, 125 Cal. 291 [57 P. 1001].) However, all the cases we have found deal with situations where parents were claiming title against their children and vice-versa. (See *Huntley* v. *San Francisco Savings Union*, 130 Cal. 46 [62 P. 255]; *Reed* v. *Smith*, 125 Cal. 491 [58 P. 139]; *Rix* v. *Horstmann*, 93 Cal. 502 [29 P. 120]; *Andreotti* v. *Andreotti*, 224 Cal.App.2d 533 [36 Cal.Rptr. 709].) Although we have found no case which involves a brother-in-law claiming title against a deceased brother-in-law's wife, we do not feel that the facts of this particular case fall within the purview of a familial relationship. In respondent's own testimony, she stated that she had little or no contact with the Cruz family from the time of Albert's death in 1938 until 1949, when she remarried. Thus she was not related to the appellant or his deceased wife from 1949, the time from which the appellant asserts the adverse possession period ran. We conclude that there was no fiduciary relationship between the parties.[4]

bate proceedings, to Carrie." Conclusion of law No. 1, in pertinent part, states: "Carrie became the owner of said property upon distribution of Albert's estate in 1939."

[4]Even if we were to assume that there was a fiduciary relationship between the parties, in this particular case we are of the opinion that respondent had constructive notice of the adverse claim of title.

█ With regard to appellant's other contentions, in order to acquire title by adverse possession, appellant must establish five elements in connection with his occupancy of the property: (1) possession must be by actual occupation under such circumstances as to constitute reasonable notice to the record owner; (2) possession must be hostile to the owner's title; (3) the holder must claim the property as his own, either under color of title, or claim of right; (4) possession must be continuous and uninterrupted for five years; (5) the possessor must pay all of the taxes levied and assessed upon the property during the period. (See Code Civ. Proc., § 325; *West* v. *Evans*, 29 Cal.2d 414, 417 [175 P.2d 219].)

█ The central issue in this case revolves around the first element: whether one can adversely possess property to which the legal owner (Carrie Watson) is unaware that she has any right. The rule in California respecting this issue was expressed by the Supreme Court in *Sorensen* v. *Costa*, 32 Cal.2d 453, 461 [196 P.2d 900], where the court stated: "Appellant also contends that the mutual mistake precludes respondent from showing that his possession and that of his predecessors was under 'such circumstances as to constitute reasonable notice to the owner.' (*West* v. *Evans, supra,* 29 Cal.2d 414, 417.) Appellant has evidently misconstrued the foregoing language to mean that a person claiming title by adverse possession must establish that the record owner knew of his own rights in the land in question. All that the claimant must show, however, is that his occupation was such as to constitute reasonable notice to the true owner that he claimed the land as his own. *The fact that the record owner was unaware of his own rights in the land is immaterial.*" (Italics added.) (See also, *Kraemer* v. *Kraemer*, 167 Cal.App.2d 291 [334 P.2d 675]; 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 57, p. 1819.)

Since it is clear that one can claim title from an owner even though the owner is unaware of his own rights to the property, we are of the opinion that there was sufficient notice to Carrie as a matter of law to satisfy the notice requirement. In this case, Carrie testified that she had actual knowledge of the Lobros' occupation of Lot 14 as early as 1949. As the court stated in *Wood* v. *Davidson*, 62 Cal.App.2d 885, 890 [145 P.2d 659], "If the adverse claimant is in open . . . possession . . . and the true owner fails to look after his interests and remains in ignorance of the claim, it is his own fault." Even if Carrie had no actual knowledge of the Lobros' occupancy, it is well established that "[o]pen, notorious, and visible possession is the equivalent of actual knowledge." (*Id.*)

In the instant case, there can be no question under the findings of the trial court that the occupation by the Lobros was such as to constitute reasonable notice that they claimed the property as their own.

Respondent argues that because Hortense asserted to Mary Silva on at least two occasions that Albert owned the property, this negates the hostile element. However, Mary testified that Hortense "used to tell me . . . I don't *think* this property is ours, belongs to my brother." (Italics added.) Although we have not found any California cases on this point, it has been held in other jurisdictions that such a statement does *not* interrupt the running of the statute of limitations in face of the open, notorious, and visible possession of the property. (See *Bruch* v. *Benedict*, 62 Wyo. 213, 235 [165 P.2d 561, 567-568]; *Fulton* v. *Rapp,* 59 Ohio L.Abs. 105 [45 Ohio Ops. 494, 497, 98 N.E.2d 430].) As the Supreme Court of Wyoming stated in *Bruch* (at p. 568): "[I]t is clear that neither the mere offer to buy, nor the acknowledgment of the claimant that the title was in another, *or that he did not own the land,* is sufficient to suspend the running of the statute." (Italics added.) Thus, the mere fact that one thinks that the property one is claiming title to belongs to another is irrelevant so long as there is the *claim* to title adverse to all others; to hold otherwise would only permit adverse possession under color of title and not under claim of right. It is clear from finding of fact No. 8[5] that Joaquin intended to use the land as his own, to the exclusion of all others. (*Sorenson* v. *Costa, supra,* at p. 459.) There is no evidence that Joaquin ever doubted his ownership of the property. Furthermore, the series of recorded conveyances between the Lobros and Mary Silva—even though they are of no legal effect—[6] not only evidenced an intent on the part of the Lobros to claim title to the property, but also imposed notice to the world of their claim. (See *Kraemer* v. *Kraemer, supra,* 167 Cal.App.2d 291, 309; *Bruch* v. *Benedict, supra,* 62 Wyo. 213, 232 [165 P.2d 561, 567].)

An additional factor which must also be taken into consideration in this case is that Carrie was the administratrix and sole intestate heir of

[5]Finding of fact No. 8, in pertinent part, states: "Joaquin continues to reside there. During his occupancy, he has maintained the improvement, fenced the lot, replaced the roof, planted trees, and paid the taxes."

[6]We do not reach the issue of what effect the trial court's finding that the Lobros "knew about or were on notice that Lot 14 was owned by Carrie" and that "neither Hortense nor Mary had any interest therein that could be conveyed to Hortense and Joaquin," would have on whether the Lobros can claim the property under color of title. (See *Johns* v. *Scobie,* 12 Cal.2d 618, 627 [86 P.2d 820, 121 A.L.R. 1404]; *Pease* v. *Gibson,* 37 Cal.App.2d 353, 356 [99 P.2d 353].)

Albert's estate. She was therefore under an affirmative duty to marshal the assets of the estate. (Prob. Code, § 571; *Estate of Turino,* 8 Cal.App.3d 642, 647 [87 Cal.Rptr. 581].) As administratrix, she was required to exercise the degree of care and prudence that an ordinary person would employ in handling his or her own affairs. (*Estate of Crosby,* 55 Cal. 574, 580; *In re Chadbourne,* 15 Cal.App. 363, 372 [114 P. 1012].) ██ We are of the opinion that the exercise of due diligence required Carrie to check the grantor-grantee indexes in Los Angeles County to ascertain whether Albert had any recorded property. (See Gov. Code, §§ 27232, 27233; *Estate of La Motta,* 7 Cal.App.3d 960, 963 [86 Cal.Rptr. 880].) Had she exercised due diligence and checked the indexes, she would have found the property listed, since the conveyance from Jesus to Albert was recorded. We do not intend to hold that an administrator is under a duty to check these indexes in every estate. Where, however, a minimal inquiry of friends and family of the deceased would supply at least a suggestion that decedent had real property interests, it certainly is the duty of the administrator to do so. The Cruz family, or part of them (including Jesus), visited Carrie after Albert's death; they would have apprised Carrie of the lot upon such inquiry. Not having made such a minimal inquiry constitutes negligent administration of the estate. Carrie may not, at this late date, rely upon lack of knowledge of the property.

██ Accordingly, we conclude that as a matter of law, Joaquin Lobro satisfied all the elements of adverse possession.

The judgment is reversed.

Ashby, J., and Hastings, J., concurred.